Case No. 16-1954

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

## *IN RE*: KNOWLES ELECTRONICS, LLC,
*Appellant*

Appeal from the United States Patent and Trademark Office, Patent Trial
and Appeal Board, in No. 2015-004989.

## APPELLANT KNOWLES ELECTRONICS, LLC'S
## CORRECTED PRINCIPAL BRIEF

Richard L. Rainey
Brian G. Bieluch
Michael S. Sawyer
Cyril Djoukeng
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth St. NW
Washington, DC 20001-4956
Tel: (202) 662-6000

*Attorneys for Appellant Knowles
Electronics, LLC*

September 12, 2016

# CERTIFICATE OF INTEREST

Counsel for Appellant Knowles Electronics, LLC, certify the following:

1.    The full name of every party or amicus represented by me is:

   Knowles Electronics, LLC

2.    The name of the real party in interest, if the party named in the caption is not the real party in interest, represented by me is:

   Knowles Electronics, LLC

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   Knowles Electronics, LLC is a privately held company that is owned, through intermediate entities, by Knowles Corporation, which is a publicly held company traded on the New York Stock Exchange under ticker symbol KN.  Franklin Resources, Inc., a publicly held company traded on the New York Stock Exchange under ticker symbol BEN, owns 10% or more of the stock of Knowles Corporation. Janus Capital Management LLC is a privately held company that owns 10% or more of the stock in Knowles Corporation. The 2015 Form 10-K of Janus Capital Group Inc., a publicly held company traded on the New York Stock Exchange under ticker symbol JNS, lists Janus Capital Management LLC as a wholly-owned subsidiary.  No other publicly held company owns 10% or more of the stock of Knowles Electronics, LLC or Knowles Corporation.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

William Cramer of Lathrop & Gage LLP (formerly of Dykema Gossett PLLC); Steven McMahon Zeller, Timothy K. Sendek and Jonathan Giroux of Dykema Gossett PLLC.

Date: September 12, 2016

/s/ Brian G. Bieluch
Richard L. Rainey
Brian G. Bieluch
Michael S. Sawyer
Cyril Djoukeng
COVINGTON & BURLING LLP
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-6000

*Attorneys for Appellant*

# TABLE OF CONTENTS

**Page**

Statement of Related Cases ........................................................................ viii

Jurisdictional Statement ................................................................................. 1

Statement of Issues ........................................................................................ 2

Preliminary Statement .................................................................................... 3

Statement of the Case and Relevant Facts .................................................... 7

    I.    Technology Background Section ........................................................ 7

        A.    Electronic Packaging ............................................................. 7

        B.    MEMS Microphone Packages ............................................ 12

    II.    U.S. Patent No. 8,018,049: Silicon Condenser Microphone Package ........................................................................................... 15

    III.    Halteren Reference: Flexible Substrate Transducer Assembly ........................................................................................ 20

    IV.    *MEMS Technology Berhad v. International Trade Commission*, 447 F. App'x 142 (Fed. Cir. 2011) ................................................... 23

    V.    Procedural History .......................................................................... 26

        A.    Analog's Request for *Inter Partes* Reexamination of U.S. Patent No. 8,018,049 .................................................. 26

        B.    The Examiner's Decision .................................................... 28

        C.    Knowles's Appeal to the Patent Trial and Appeal Board ................................................................................... 37

        D.    The Board's Decision .......................................................... 41

Summary of Argument .................................................................................. 54

Argument ....................................................................................................... 56

    I.    Standard of Review .......................................................................... 56

    II.    Apparatus Claims: The Board's Failure to Apply *MEMS Technology* and Related Evidence Requires Reversal or, at a Minimum, a Remand Pursuant to *Power Integrations* .............. 57

A.   At the Outset, the Court Should Remand for Failure
to Resolve the Basic Claim Construction Dispute.............58

B.   The Board Erred by Failing to Apply *MEMS
Technology* and Related Evidence........................................62

C.   Alternatively, the Court Should Remand Pursuant
to *Power Integrations* for the Board to Address
*MEMS Technology*.................................................................72

D.   The Halteren "Assembly" Does Not Disclose a
"Package" .................................................................................74

III.   Method Claims: The Board's New Obviousness Finding
Requires Vacatur and Remand.......................................................74

Conclusion...........................................................................................................80

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Biedermann*,
  733 F.3d 329 (Fed. Cir. 2013) ...........................................................78

*In re Cortright*,
  165 F.3d 1353 (Fed. Cir. 1999) .........................................................69

*CSR, PLC v. Skullcandy, Inc.*,
  594 F. App'x 672 (Fed. Cir. 2014) ....................................................62

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) .........................................................57

*Gechter v. Davidson*,
  116 F.3d 1454 (Fed. Cir. 1997) ...........................................58, 59, 62

*InTouch Techs., Inc. v.VGO Commc'ns, Inc.*,
  751 F.3d 1327 (Fed. Cir. 2014) .........................................................57

*In re Leithem*,
  661 F.3d 1316 (Fed. Cir. 2011) .........................................................78

*In re Magnum Oil Tools Int'l*,
  ---F.3d ---, No. 2015-1300, 2016 WL 3974202 (Fed. Cir. July 25,
  2016) ...................................................................................................57

*MEMS Technology Berhad v. International Trade Commission*,
  No. 2010-2018, 447 F. App'x 142 (Fed. Cir. 2011) ...............*passim*

*Microsoft Corp. v. Proxyconn, Inc.*,
  789 F.3d 1292 (Fed. Cir. 2015) ...........................................56, 63, 64

*In re Morris*,
  127 F.3d 1048 (Fed. Cir. 1997) .........................................................69

*Nat'l Ass'n of Clean Water Agencies v. EPA*,
734 F.3d 1115 (D.C. Cir. 2013)........................................................64

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*,
403 F.3d 1364 (Fed. Cir. 2005) .......................................................58

*In re NTP, Inc.*,
654 F.3d 1279 (Fed. Cir. 2011) ...................................................5, 69

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) .......................................................62

*Power Integrations, Inc. v. Lee*,
797 F.3d 1318 (Fed. Cir. 2015) ..............................................*passim*

*Rambus Inc. v. Rea*,
731 F.3d 1248 (Fed. Cir. 2013) .........................................75, 76, 78

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*,
824 F.3d 999 (Fed. Cir. 2016) ...................................................5, 67, 68

*In re Stepan Co.*,
660 F.3d 1341 (Fed. Cir. 2011) ..............................................*passim*

*In re Suitco Surface, Inc.*,
603 F.3d 1255 (Fed. Cir. 2010) .....................................................69, 72

*V-Formation, Inc. v. Benetton Group SpA*,
401 F.3d 1307 (Fed. Cir. 2005) .................................................56, 64

*In re Zurko*,
258 F.3d 1379 (Fed. Cir. 2001) .......................................................57

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ....................................................................1

35 U.S.C. § 141 (2010)..........................................................................1

35 U.S.C. § 315(a)(1) (2010)................................................................1

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Appellant Knowles Electronics, LLC states that issues relating to this appeal were previously before this Court in *MEMS Technology Berhad v. International Trade Commission*, No. 2010-2018, 447 F. App'x 142 (Fed. Cir. 2011) (Lourie, Mayer, Gajarsa JJ.) and that an appeal from reexamination proceedings for a patent in a similar subject matter area with the same inventor as here is pending before this Court in *Knowles Electronics, LLC v. Cirrus Logic, Inc.*, No. 16-2010 (Fed. Cir.).  Knowles further states that, in *Knowles Electronics, LLC v. AAC Technologies Holdings, Inc., et al.*, No. 1:06-cv-6213-EEC (N.D. Ill.), a third party that settled prior litigation is seeking to challenge its royalty obligation based upon reexamination proceedings for U.S. Patent No. 6,781,231, which are at issue in No. 16-2010.  Knowles has respectfully submitted in those district court proceedings that the reexamination proceedings are irrelevant to the settlement.

# JURISDICTIONAL STATEMENT

In this appeal from an *inter partes* reexamination, the Patent Trial and Appeal Board ("Board") issued its Decision on Appeal ("Decision") on August 31, 2015.  Appx1-18.  Knowles Electronics, LLC ("Knowles") timely filed a request for rehearing on September 29, 2015.  Appx3076-3090.  The Board denied that request on February 18, 2016 ("Rehearing Decision").  Appx20-33.  Knowles timely filed a Notice of Appeal on March 21, 2016.  Appx3107-3108.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141, 315(a)(1) (2010).

# STATEMENT OF ISSUES

1.   Whether the Patent Trial and Appeal Board (the "Board") erred in failing to resolve fundamental claim construction disputes regarding the claim term "package," while rejecting with limited analysis Knowles's proposed construction.

2.   Whether the Board erred by adopting on rehearing a construction for "package" based on an out-of-context sentence from an extrinsic reference, where that construction ignores and does not fairly address this Court's prior *MEMS Technology* decision construing the same term, is contrary to the very reference cited, and is contrary to the intrinsic and extrinsic evidence.

3.   Where the Examiner wholly failed to issue findings in support of combining prior art references and utilized the claims as a roadmap for combining references, whether the Board erred by adopting for the first time a new rationale for combining prior art references, without remanding to provide an opportunity to build a record in response.

# PRELIMINARY STATEMENT

In *MEMS Technology Berhad v. International Trade Commission*, No. 2010-2018, 447 F. App'x 142 (Fed. Cir. June 3, 2011), this Court extensively analyzed a patent related to the patent-in-suit as well as a contemporaneous patent by the same inventor.  After careful review of the specifications, the Court concluded that "the essence of the invention claimed [in the contemporaneous] patent is the containment of the components in a 'package,'" Appx3174, that the inventor's "package" requires a "self-contained unit that has two levels of connection, to the device and to a circuit (or other system)," Appx3184 (citations omitted), and that the "requirement that the components come together to form a *mountable* package is . . . an important characteristic of the claimed invention."  Appx3174 (emphasis added).

*MEMS Technology* is listed in the face of the patent-in-suit, U.S. Patent No. 8,018,049 (the '049 patent).  Appx156.  As a matter of law, a skilled artisan need look no further than the face of the patent to determine the claim construction for "package"; the patent was issued with the express understanding that this Court had explained the term.

Despite Knowles's repeated explanations of this to the Examiner and

the Board, *see* Appx667-668, Appx2787, Appx2791-2792, Appx2814, as well

as repeated explanations of how the Court's construction is compelled by

intrinsic and extrinsic evidence, the Examiner disagreed with the Court,

and indicated: "[Q]uestions about 'how to connect the microphone die . . .

to the outside world?' [are] irrelevant to . . . claim interpretation" because

the claims do not require "any second level interconnection."  Appx109.

The Board declined to cite or discuss *MEMS Technology* in its Decision.  In

fact, the Board's Decision declined to adopt any specific construction for

"package"; it simply rejected Knowles's construction.  Under this Court's

precedent, this basic failure to resolve claim construction issues itself

warrants remand.

   After Knowles pressed this Court's interim decision in *Power*

*Integrations, Inc. v. Lee*, 797 F.3d 1318, 1327 (Fed. Cir. 2015), making explicit

that the Board has an "obligation" to evaluate a previous judicial

interpretation of disputed claim terms where a party's "argument to the

board about the proper interpretation of" disputed claim terms is "tied" to

such an interpretation, *id.*, let alone where the judicial opinion is listed on

the face of the patent, the Board relegated *Power Integrations* to a footnote

4

and still declined to address *MEMS Technology*.  Appx18.  On rehearing, presented with the issue again, the Board cited *MEMS Technology*, but still declined to substantively engage.  Appx27.

Fundamentally, the Board's construction of "package," to the extent one was even reached, was "divorced from the specification and the record evidence," *In re NTP, Inc.*, 654 F.3d 1279, 1288 (Fed. Cir. 2011), and sought to rely upon "extrinsic evidence that contradicts the intrinsic record." *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1003 (Fed. Cir. 2016).  The Board's affirmance of claims 1, 2, 5, 6, 9, 11, 12, 15, 16, and 19 (the "apparatus claims") turns upon its improper construction of "package" and must be vacated.

Regarding claims 21–23, 25, and 26 (the "method claims"), the Examiner reviewed the method claims, and, starting with a reference from one field, asserted, without making supporting findings, that it would be a matter of simple substitution to remove one limitation and look to a reference in another field in order to arrive at the combination set forth in the method claims.  The Examiner misunderstood the challenges facing the packaging of MEMS technology in the 2000–01 time period, resulting in his failure to provide an articulated rationale in support of his findings.

5

Recognizing the problem, the Board offered a new rationale. The Board stated that because the Examiner referenced a "*condenser microphone*" reference and a "*silicon condenser microphone*" reference, Appx28 (emphasis in original), the Board could enter a finding, *inter alia*, that: "silicon microphone 61 of Halteren sends output signals to ASIC 62 and solid state device 8 of Une converts capacitance measured from electret capacitor microphone, both Halteren and Une apply similar modes of operation by converting measured vibration into signals." Appx14; *see also* Appx29. The finding is wrong, as explained below.

But more importantly, it runs afoul of well-established precedent that "[m]ere reliance by the Board on the same type of rejection or the same prior art references relied upon by the examiner, alone, is insufficient to avoid a new ground of rejection where it propounds new facts and rationales to advance a rejection—none of which were previously raised by the examiner." *In re Stepan Co.*, 660 F.3d 1341, 1345 (Fed. Cir. 2011) (emphasis added). Vacatur is required; the Board must provide an evidentiary opportunity to build a record in response.

## STATEMENT OF THE CASE AND RELEVANT FACTS

### I.    Technology Background Section

#### A.    Electronic Packaging

The "technology of electronic packaging" is "often understandably described as the technology of electronic interconnections." Appx710; Appx703 ("Packaging of LSI electronic circuits is the science and art of establishing interconnections and a suitable operating environment for primarily electronic circuits . . . ."). By the year 2000, it was "widely accepted that proper electronic packaging fundamentals and practices must be considered in the initial system design phases" because "electronic packaging is often the critical limiting factor in the success of modern electronic systems." Appx710.

Electronics packaging is a "multidisciplinary" field. Appx700. Because it "involves the solution of electrical, mechanical, and thermal problems," packaging "requires understanding at the molecular level not only of silicon but of metals, ceramics, polymers, glass, and composites." *Id.* Handbooks on packaging therefore describe the field of packaging as "those designs and interconnection technologies necessary to support electrically, thermally, mechanically, and chemically those semiconductor

devices with micron dimensions that are often referred to as integrated

circuits." Appx703.

There are several levels of electronics packaging, including integrated

circuit packaging, circuit card packaging, and backplane packaging. These

levels are illustrated in the below figure of the "electronic packaging

hierarchy":



Polycrystalline silicon nuggets

IC chip fabrication

First-level packaging (IC packaging)

Second-level packaging
(package assembly to circuit card)

Third-level packaging
(circuit card assembly to backplane)

**FIGURE 7.1**   Electronic packaging hierarchy.

Appx714. First-level packaging or IC packaging concerns "packaging and

interconnecting integrated circuits (ICs)" and is one of "the most critical

levels of electronic packaging." Appx713. Integrated circuits are "at the

heart of electronic system controls." *Id.* Because "they are typically

sensitive to electrical, mechanical, physical, and chemical influences,

they require special considerations by the packaging engineer." *Id.* Thus,

an important function "of the IC package is to protect the chip from

mechanical stress, environmental stress (such as humidity and pollution),

and electrostatic discharge during handling." Appx714.

As seen in Figure 7.1 above, the IC package "provides mechanical

interfacing for . . . electrical interconnection to the next level of packaging."

Appx714-715. As the "middle link" between the integrated circuit and the

system, the IC package "must respond to demands from both ends, that is,

wafer fabrication and device trends upstream (circuit level) and circuit

board assembly and system performance trends downstream (system

level)." Appx713. That duality "is particularly true in the design, piece

part fabrication, and assembly aspects of IC packaging." *Id.*

Another way to describe a first-level or IC package is as a "chip

carrier." Appx729-730 ("The packaging of a chip or a set of chips in a

functional and protective chip carrier is referred to as *first-level packaging*.").

An alternative depiction of the packaging hierarchy is also shown below in

Figure 1.1:



**Figure 1.1**  Packaging hierarchy of an electronic system.

Appx728.  As seen above, "the individual chip carriers are mounted on a

common base, usually a printed wiring board (PWB)," in order to connect

the first-level package to the second-level package.  Appx730.

"The external connections of a chip carrier serve to classify the

component into one of the two major technological categories: *through hole*

components (THC) and *surface mount* components."  Appx730; *see also*

Appx750 ("In general, IC packages can be classified into two categories: 1)

through-hole, and 2) surface mount.").  Figure 2.23 below illustrates these

two types of IC packages:

10



**FIGURE 2.23** Through-hole packages and surface mount packages.

Appx751. As seen above, "through hole components" contain "leads (external connectors) or *pins*" that are "inserted through a common mounting surface" in a second-level package, *i.e.*, a printed wiring or circuit board. Appx730, Appx750. "For surface mount components, the chip carrier is connected directly to the mounting surface." Appx730. "The advantage of the surface mount package, as compared to through-hole, is that both sides of the [printed circuit board] can be used, and therefore, higher packing density can be achieved on the board." Appx750.

11

### B.    MEMS Microphone Packages

The second area of technology at issue in this appeal are microphones made using micro-electro-mechanical systems (MEMS) technology, and the packaging of such devices.  In 1982, K. Peterson described the evolving concept of using "Silicon as a Mechanical Material," Appx1640, although there was no "mention of the use of the technology to create microphones," Appx1635.  In 2000, "MEMS" was an "emerging technology," with the "late 1980's and early 1990's s[eeing] development of early MEMS products such as pressure sensors, accelerometers . . . , and the Digital Micromirror Device . . . ."  Appx2041.  There were further several efforts in the 1980s and 1990s to utilize MEMS technology to develop a microphone die. Appx1636-1637.  As of the application date for the patent-in-suit on November 28, 2000, *see* Appx154, however, MEMS technology was facing a critical roadblock: packaging.

On November 7, 2000, the National Science Foundation ("NSF") convened a workshop to address, as one of three "critical areas," "MEMS packaging and reliability."  Appx2031.  The NSF "brought together exper[ts] from industry, academia, and government in the field of

manufacturing of Micro-ElectroMechanical Systems (MEMS)" in order to address "existing barriers and opportunities in the field." *Id.*

The Final Report, which reflected "a large degree of unanimity," *id.*, concluded that "direct application of electronics packaging techniques to most MEMS parts is not feasible because of the complexities of their operational structure," that "many MEMS packaging problems are new to most . . . electronic packaging engineers," Appx2111, and that "it is impossible to develop a 'standard' package to serve all the MEMS functional interfaces," Appx2045; *see also* Appx2838. The NSF workshop determined, in short, that packaging was "one of the major technical barriers that might hamper the growth of MEMS applications," Appx2036, "a well-known potential showstopper," Appx2044, and a "major challenge," *id.* These unique design challenges with MEMS packages arose because the "chip, package, and environment all must function together and must be compatible with each other." Chad B. O'Neal et al., Challenges in the Packaging of MEMS, Int'l Symposium on Advanced Packaging Materials p. 42 (1999), Appx635.

As recounted in an industry retrospective in *Acoustics Today* in 2009, "Knowles created a major stir when they released the first commercially available MEMS microphones," Appx1639, with "[t]he first commercialization of MEMS microphones [being] in 2003 when Knowles released the SiSonic® surface mount MEMS microphone," Appx1637. Knowles's SiSonic surface mount MEMS microphones replaced "more conventional Electret Condenser Microphones (ECMs), which are temperature sensitive and therefore less stable." Appx1642. By October 2006, Knowles "had already shipped [in excess of] 300 million SiSonic SMD microphones," the majority of which were used in mobile phones. *Id.*

Knowles has protected its invention through a variety of patents. One of the important aspects of the SiSonic surface mount MEMS microphone is its surface mountable package:

$SiSonic^{TM}$ *Package*



Appx1665.  With "direct application of electronics packaging techniques to most MEMS parts" being "not feasible because of the complexities of their operational structure," Appx2111, Knowles claimed various aspects of its new design, including aspects of its "package" that led to the patent-in-suit.

## II.    U.S. Patent No. 8,018,049: Silicon Condenser Microphone Package

To protect its significant R&D investment, Knowles sought and obtained several patents.  The '049 patent, the subject of these proceedings,

focuses on a particular "package" and a method for manufacturing the

same.  Appx154-183.  Figure 7 shows a cross-sectional view:



## FIGURE 7

Appx160.  This silicon condenser microphone package includes a housing

42 formed from "top, bottom, and side portions 48, 50, 52" that "are

electrically connected" to provide EMI shielding.  Appx177 (4:14-37).  The

package also contains a transducer 58 in communication with "acoustic

port 54 for receiving an acoustic signal."  *Id.*  The bottom portion of this

microphone package "further comprises solder pads 70 for electrical

connection to an end user's board."  Appx178 (6:40-42).  With these solder

16

pads, the silicon condenser microphone package can be "attached to an end user's [printed circuit board] via a solder reflow process." Appx177 (4:9-11).

Figure 26 shows an additional embodiment:



**FIGURE 26**

Appx172. This embodiment contains solder pads 70 on both the top and bottom of the package housing, thereby allowing "connection to the end user's board" either through the top or bottom portion. Appx179 (7:38-43).

This permits the "*package mounting orientation*" to be either "top portion 48

down or bottom portion 50 down." *Id.* (emphasis added).

Figure 4 illustrates how the silicon condenser microphone packages

described in the patent are connected to a "user's" board 28:



**FIGURE 4**

Appx158. This figure shows how "surface mounting to a user's 'board' 28"

results in the silicon condenser microphone package 10 being mechanically

attached to the end user's circuit board 28. *See* Appx177 (3:54-55).

Claim 1 is directed to a "silicon condenser microphone package":

1. A silicon condenser microphone *package* comprising:

a package housing formed by connecting a multi-layer
substrate comprising at least one layer of conductive material

and at least one layer of non-conductive material, to a cover comprising at least one layer of conductive material;

a cavity formed within the interior of the package housing;

an acoustic port formed in the package housing; and

a silicon condenser microphone die disposed within the cavity in communication with the acoustic port;

where the at least one layer of conductive material in the substrate is electrically connected to the at least one layer of conductive material in the cover to form a shield to protect the silicon condenser microphone die against electromagnetic interference.

Appx181 (emphasis added).

Claim 21 recites "a method of manufacturing a silicon condenser

microphone package":

21. A method of manufacturing a silicon condenser microphone package comprising:

providing a panel comprising a plurality of interconnected package substrates, where each of the plurality of package substrates comprises at least one layer of conductive material and at least one layer of non-conductive material;

*attaching a plurality of silicon condenser microphone dice to the plurality of package substrates, one die to each package substrate;*

attaching a plurality of package covers, each comprising at least one layer of conductive material, to the panel, one package cover to each of the package substrates, where attaching the plurality of package covers to the panel comprises electrically connecting the at least one layer of conductive material in the

package cover to the at least one layer of conductive material in the corresponding package substrate to form a shield to protect the silicon condenser microphone die against electromagnetic interference; and

separating the panel into a plurality of individual silicon condenser microphone packages.

Appx182 (emphasis added).  As the Board noted, the dispute in this case turns on the "package" and "attaching" limitations.  Appx4-5.

## III.  Halteren Reference: Flexible Substrate Transducer Assembly

U.S. Patent No. 6,324,907 to Halteren ("Halteren") is directed to a "flexible substrate and a transducer *assembly*" incorporating the flexible substrate.  Appx221 (emphasis added).  Figure 4 shows the flexible substrate:



FIG. 4

Appx226.  This flexible substrate is composed of multiple layers of flexible

materials, consisting of Kapton and glue.  Figure 1 of Halteren illustrates

the "lower surface of [the] flexible substrate":



FIG. 1

Appx222, Appx230 (7:11-13).  Exposed conductors 20 to 23 are "utilized as contact pads that provide required electrical connections between assembly 10 and a piece of electronic equipment (not shown) that holds a connector adapted to contact and fix the position of the exposed parts."  Appx230 (7:28-36).

Halteren does not depict how flexible assembly 10 is mechanically connected to another piece of electronic equipment.  Instead, Halteren indicates that another "piece of electronic equipment" is responsible for "holding the assembly."  *Id.* at 8:42-45.  That other piece of electronic equipment must hold the assembly because the "total length of the flexible member 40 is, preferably, within range from 15 to 100mm."  *See id.* at 8:19-21.

## IV. *MEMS Technology Berhad v. International Trade Commission*, 447 F. App'x 142 (Fed. Cir. 2011)

In *MEMS Technology*, Appx3155-3191, this Court previously addressed at length the construction of the term "package" in an appeal from a determination by the International Trade Commission involving two patents by the same inventor as the '049 patent, Anthony Minervini: U.S. Patent Nos. 7,242,089 (the "'089 patent") and 6,781,231 (the "'231 patent").

The '089 Patent is in the same family as the '049 patent at issue here; the '231 patent is in a different family, although it shares the same inventor, addresses similar subject matter, and was filed for in September 2002. Knowles submitted a terminal disclaimer during prosecution of the '049 patent with respect to the '231 patent. Appx183. *MEMS Technology* was before the original Examiner during prosecution of the '049 patent, Appx156, leading to the '049 patent's claimed "package."

Each of the '049, '231, and '089 patents contain apparatus claims that recite a "package" typically in the claim preamble and recite elements of various claimed microphone packages (*e.g.*, housing, substrate, microphone, and acoustic port). *Compare* Appx181, *with* Appx3157-3159.

23

In *MEMS Technology*, this Court noted that "when the preamble is essential to understand limitations or terms in the claim body, the preamble limits claim scope." Appx3173 (internal quotation omitted). Examining the term "microelectromechanical system package" in the preamble of certain claims in the '231 patent and addressing extensive intrinsic evidence, the Court concluded that the term constituted a limitation:

> We conclude that the Commission correctly determined that the disputed preambles are claim limitations. "[W]hen the preamble is essential to understand limitations or terms in the claim body, the preamble limits claim scope." *Catalina M*[*ktg. Int'l, Inc. v. Coolsavings.com, Inc.*], 289 F.3d [801,] 808 [(Fed. Cir. 2002)]. The body of claim 1 lists a microphone, a substrate, a cover, and a housing formed by connecting the cover and the substrate. The body of claim 2 lists a microphone, a substrate, and a cover. As the Commission correctly concluded, . . . the *specification describes mounting the MEMS "packages" of the invention on end-users' printed circuit boards* ("PCBs"), '231 patent col.3 ll.3–16. Indeed, the *essence of the invention claimed in the '231 patent is the containment of the components in a "package." See, e.g.*, '231 patent title ("Microelectromechanical System Package with Environmental and Interference Shield" (emphasis added)); col.1 ll.8–12, 36–41; col.3 ll.3–4; col.4 ll.40–43; col.5 ll.2–5. The requirement that the components listed in the claim body *come together to form a mountable package* is thus an "important characteristic of the claimed invention." *Poly–Am.*[*, L.P. v. GSE LiningTech., Inc.*], 383 F.3d [1303,] 1310 [(Fed. Cir. 2004)]. Yet, standing alone, the bodies of claims 1 and 2 do not require that the listed components come together in this way to constitute a package.

24

*Id.* (additional emphasis added).  The Court applied the same analysis to the term "surface mountable package" in the '089 patent's claims, in analyzing an obviousness argument based on U.S. Patent 4,533,795 ("Baumhauer"): "Baumhauer does not teach a 'surface mountable package.'  As the Commission found, Baumhauer Figure 6 discloses a microphone attached directly to a circuit board, not a unit with components that come together to *form a mountable package*." *Id.* at 157 (emphasis added).

This Court further affirmed the Commission's determination that, *inter alia*, "a package be capable of *two* levels of electrical connection—one from the device to the package, and one from the package to an external circuit or other system."  Appx3183-3184 (emphasis added); *see* Appx3184 ("[O]ne of ordinary skill in the art would know that a 'package' is a self-contained unit that has two levels of connection, to the device and to a circuit (or other system).  If there is only one connection level, then there is no package.") (citations omitted).  Accordingly, the Court affirmed the Commission's finding that Baumhauer was not anticipatory because it did "not disclose a MEMS 'package'" as it does "not disclose first and second levels of electrical connection."  *Id.*

## V.   Procedural History

### A.    Analog's Request for *Inter Partes* Reexamination of U.S. Patent No. 8,018,049

On December 23, 2011, Third Party Requester Analog Devices, Inc. ("Requester") filed a request for *inter partes* reexamination of fourteen claims of the '049 Patent. Appx341-409. Analog's Request asserted that the challenged apparatus claims were anticipated by Halteren, and the challenged method claims were rendered obvious in view of U.S. Patent No. U.S. 6,594,369 ("Une") and Halteren. Appx353, Appx374.

With respect to the first ground for invalidation—that the challenged apparatus claims were anticipated by Halteren—the Requester contended that the assembly in Halteren discloses the "silicon condenser microphone package" recited in claim 1 because it "refer[s] to a lid attached to the upper surface of [a] flexible elongate member and covering a transducer system." Appx353 (quotation marks omitted). The Requester focused on Fig. 2A of Halteren, asserting that it shows a "package housing formed with a lid 70 attached to the member 40." Appx353.



FIG. 2A

Appx223.  But the Requester did not provide any reason why Halteren's flexible "assembly" provides a mechanical connection to a second-level package.  *See* Appx353-355.

As to the Requester's argument that the challenged method claims were rendered obvious in view of Une and Halteren, the Requester acknowledged that Une "does not expressly teach that each microphone is in the form of a silicon die."  Appx375.  The Requester nonetheless asserted that Une, which is directed to a method for producing prior art electret condenser microphones, discloses most limitations of claim 21's "method of manufacturing a *silicon condenser* microphone package."  Appx374.  But the Requester did not provide any evidence that a skilled artisan would have had reason to substitute Halteren's silicon microphone for Une's electret condenser microphone.  *See id.*  Instead, working from the claims, the Requester noted that claim 21 "attaches a plurality of silicon condenser microphone dice to the substrates, with one die to each substrate."

Appx375. The Requester then asserted that "Halteren teaches a condenser microphone in the form of a silicon die," and "[i]t would have been obvious to use the Halteren microphone in place of the Une microphone in the process of claim 21." *Id.* The basis for the Requester's assertion was as follows: "one of ordinary skill could have substituted the Halteren microphone die for the microphone of Une in the claimed process, and the results of the substitution would have been predictable—production of an operational and functional packaged microphone." *Id.* That is, contrary to the conclusions of the National Science Foundation's workshop in the year 2000 that packaging was "one of the major technical barriers that might hamper the growth of MEMS applications," Appx2036, "a well-known potential showstopper," Appx2044, and a "major challenge," *id.*, the Requester contended that the claimed combination could be found in diverse references through substitution. *See* Appx2642-2643.

## B.    The Examiner's Decision

On March 7, 2012, the Examiner granted the Request and issued a Non-Final Action rejecting the challenged claims of the '049 patent. Appx499-624. The Examiner's initial decision did not engage in any claim construction of the term "package." *See id.* Nor did the Examiner construe

any other limitation.  *Id.*  The Examiner nonetheless stated that the Halteren assembly teaches a silicon condenser microphone "package," and that the challenged apparatus claims were anticipated by Halteren.  Appx504-508.  The Examiner also concluded that the challenged method claims were rendered obvious over Une in view of Halteren.  Appx530-534.  The Examiner, however, did not provide any rationale for combining Une with Halteren other than the conclusory statement that it "would have been obvious to one of ordinary skills [sic] in the art at the time of [sic] the invention was made to use the silicon condenser microphone of Halteren in Une's invention because the substitution of one known element for another would have yield [sic] predictable results."  Appx531.

Knowles responded on May 7, 2012.  Appx655-659.  Regarding the Examiner's rejection of the challenged apparatus claims as anticipated by Halteren, Knowles explained that the Examiner misinterpreted the meaning of a "package," which is a specific term of art employed by the inventor.  Appx668-669.  As Knowles set out, substantial intrinsic and extrinsic evidence makes explicit that a "'package' is, at a minimum, an enclosure for a device or circuit that provides (a) protection from mechanical and environmental stress, (b) a first-level interconnect between

29

the enclosed device/circuit and the package, and (c) *a second-level*

*interconnect between the package and an external printed circuit board*."

Appx670 (emphasis added).

Knowles further noted that the inventor's package was intended to

be connected to a second-level in one of two ways: through-hole mounting

and surface mounting.  The written description, Knowles noted, makes this

explicit.  Appx670-671. As Knowles further explained, the inventor's

understanding of the two methods for connecting a package to a second-

level is made plain by extensive, contemporaneous packaging treatises,

which uniformly explain that packages fall into these two overarching

categories.  *See* Appx669-672.  For example, Knowles cited the *Electronic*

*Packaging and Interconnection Handbook*, edited by Charles A. Harper (2000)

("Harper Handbook"), which states: "packages come in a variety of . . .

mounting types that are *grouped into families defined by the method of*

*mounting to level 2 [through-hole (TH) or surface-mount (SM)] . . . .*"  Appx672

(emphasis added), Appx715.  Knowles also cited *Fundamentals of*

*Microsystems Packaging* by Rao R. Tummala (2001), which states: "*In general*,

IC packages can be classified into two categories: 1) through-hole, and 2)

surface mount. These two categories refer to the methodology used in

assembling the packages to the printed wiring board (PWB)."  Appx671,

Appx750 (emphasis added).

It is worth noting that a substantial portion of the Board's analysis

would ultimately be based upon attempting to divine, if unsuccessfully,

additional categories of second-level interconnections contemplated by the

inventor, based upon the words "[i]n general" in the Tummala reference.

Applying this proper construction of "package," Knowles noted that

Halteren does not anticipate the '049 Patent, as the original Examiner

correctly found during prosecution.  Appx660, Appx672-673.  Specifically,

Halteren fails to "disclose any mechanism for securing end portion 45" of

the flexible assembly to another device and also fails to disclose any

mechanism for "stiffening that portion of flexible member 40 between" the

contact pads 20 to 23 and end portion 45.  Appx672.



## FIG. 1

The Halteren *assembly* — not package—instead describes a way to connect
only the contact pads 20 to 23 "arranged at a first end of" flexible member
40, Appx230 (7:30-32), to "a 'connector adapted to contact and fix the
position of the exposed parts,'" Appx672 (quoting Halteren, 7:32-36), on "a
piece of electronic equipment (not shown)," Appx230 (7:34-35).  But
Halteren says nothing about how its "transducer system covered by a lid
. . . arranged on the reverse side of the second end portion 45 of the flexible
member 40" may be mounted to another piece of electronic equipment.  *See
id.* (7:45-47).  As Knowles explained, Halteren's failure to disclose any
mechanism for connecting its flexible assembly to a "printed circuit board
by through-hole or surface mounting"—the two methods contemplated by
the inventor for use in providing a second-level interconnect for his

32

claimed package— confirms that Halteren does not disclose the requisite second interconnection.  Appx672.  Simply put, Halteren is an assembly, as its text indicates at length, and not a "package."

Finally, Knowles pressed this Court's decision in *MEMS Technology*, in conveying that the essence of the inventor's claimed package was found in the preamble's reference to a "package," such that a "package" must be construed to have a second-level connection to an external device. Appx673-675.  Knowles noted that the Court's analysis in *MEMS Technology* was not just persuasive authority regarding related and similar patents, but was before the Examiner in the original prosecution, Appx667-668, further reflecting precisely the meaning of the claim term "package."

As to the Examiner's obviousness rejections of the challenged method claims based on Une in view of Halteren, Knowles noted that, whereas Une "discloses the use of an electret microphone composed of discrete components mounted to a ceramic substrate," Halteren discloses "a MEMS microphone die formed on a silicon wafer and mounted to a flex circuit board."  Appx682.  Knowles explained at length that the Examiner had provided no explanation for why elements would be swapped between these two references in discrete fields and, assuming *arguendo* one did so in

hindsight, noted numerous problems that would arise with regard to making such a substitution in the burgeoning MEMS field.  Appx675-678.

On June 5, 2012, the Requester responded with conflicting positions regarding the meaning of "package."  The Requester first contended that "package" should be construed so that "[a]ll that is needed for [a second-level] interconnection is an electrical connection to another device outside the package (to the 'outside world')."  Appx777.  Several pages later, however, the Requester argued that this construction was too narrow, and urged the Examiner to disregard *MEMS Technology*.  *See* Appx782.  The Requester did not address Knowles's argument that Halteren fails to "disclose any mechanism for securing end portion 45" to another device. *See* Appx672.

On June 7, 2013, the Examiner issued a non-final Action Closing Prosecution, maintaining rejections of all challenged claims.   Appx1055-1149.   The Examiner largely copied and pasted the claim construction arguments from the Requester's June 2012 written comments.  *Compare, e.g.*, Appx1116-1117, *with* Appx774-775.  For example, the Examiner copied even the Requester's citation sentences, down to the "emphasis added" parenthetical, although the Examiner failed to carry over the emphasis.

34

*Compare* Appx1117, *with* Appx774.  While the Examiner did not fully embrace Requester's first position that the inventor's claimed package requires "an electrical connection to another device outside the package (to the 'outside world')," the Examiner wholly adopted Requester's conflicting second position that *MEMS Technology* is entitled to no weight in construing the term "package."  *See* Appx1124-1125.  The Examiner did not respond to Knowles having noted that Halteren fails to "disclose any mechanism for securing end portion 45" to another device.  *See* Appx672.

Regarding the obviousness rejections of the challenged method claims, the Examiner maintained his practice of not articulating any rationale to combine Une and Halteren aside from an assertion of simple substitution without corresponding findings.  Appx1134.

On July 8, 2013, Knowles responded, Appx2619-2656, once again challenging for additional reasons the contention that Halteren's flexible substrate anticipates the inventor's claimed "package," and again noting that the Examiner had not made out a case for obviousness for the method claims, noting the numerous objective indicia of non-obviousness, and evidence relating thereto, that demonstrate the hindsight bias exhibited by

the Examiner's failure to support the proposed obviousness combination. Appx2637; *see* Appx2637-2654.

On March 17, 2014, the Examiner issued a Right of Appeal Notice, maintaining his rejections. For the first time, the Examiner adopted an express construction of "package": "In this case, the limitation 'package' has been given the broadest reasonable interpretation which is an embodiment that provides environmental protection and electromagnetic shielding while *interconnecting the transducer microphone to an electronic system*." Appx107-108 (emphasis added). That is, the Examiner determined that the *only* connection required by a microphone "package" is between the microphone device and another electronic system, thereby eschewing this Court's construction that "a 'package' is a self-contained unit that has *two levels of connection*, to the device and to a circuit (or other system)." Appx3183-3184 (emphasis added). Disagreeing with the premise of *MEMS Technology*, the Examiner asserted: "questions about 'how to connect the microphone die . . . to the outside world?' [are] irrelevant to . . . claim interpretation" because the claims do not require "any second level interconnection." Appx109.

As to obviousness, the Examiner maintained his practice of articulating no rationale for combining Une and Halteren other than simple substitution without corresponding findings. *See* Appx2712-2713.

Knowles timely appealed the Examiner's findings and conclusions to the Patent Trial and Appeal Board. Appx2758-2759.

## C.    Knowles's Appeal to the Patent Trial and Appeal Board

On June 17, 2014, before the Board, Knowles urged reversal of the Examiner's rejections. Appx2765-2817. Knowles was explicit that proper construction of the claim term "package" was essential to understanding the inventor's claimed invention.

*First*, Knowles noted that "'package' is a term of art in the microelectronics industry," because, *inter alia*, "entire books are devoted to the topic of electronics packages." Appx2773. Multiple such references "paint a consistent picture of the common features of a microelectronics package," such that a "'package' is, at a minimum, an enclosure for a device or circuit that provides (a) protection from mechanical and environmental stress, (b) a first-level interconnect between the enclosed device/circuit and the package, and (c) a second-level interconnect

between the package and an external printed circuit board." Appx2774-2775.

*Second*, Knowles noted that the second-level interconnect between the package and another device, such as a printed circuit board, must include a mounting mechanism. Appx2776-2781. As Knowles explained, every record example of a "package," consistent with the inventor's understanding, fell into one of two categories: through-hole and surface-mount packages. *Id.* (quoting five packaging treatises unanimously agreeing). Both types of packages serve to connect the package to a "common mounting surface." Appx2777 (quoting *Handbook of Electronic Package Design* (Michael Pecht, ed., 1991)). Because there was no other credible evidence in the record that the term "package" had ever been used to refer to an assembly lacking a "mounting mechanism," Knowles asked the Board to apply the ordinary usage of the term "package," such that a package includes a mounting mechanism, and eschew an approach whereby a "package" is construed to be an assembly. Appx2780-2781.

*Third*, Knowles noted that its construction of "package" was supported at length by the specification of the '049 patent. As was the case for each contemporaneous treatise, the specification makes explicit that the

inventor considered his claimed "package" to require one of the same two mounting mechanisms: through-hole and surface mounting (using solder pads). *See* Appx2776.

*Fourth*, Knowles noted that the parties were not writing upon a clean slate, and recounted at length that its construction of package was consistent with this Court's analysis in *MEMS Technology* regarding what was contemplated by a "package." Appx2788-2790. Knowles further noted that this Court's decision was not merely persuasive, but was expressly before the original Examiner during prosecution of the '049 patent, when its claims were allowed over Halteren, Baumhauer, and Une, *see* Appx2787, Appx2791-2792, Appx2814, confirming the patentee's intention regarding the meaning of "package."

As to anticipation over Halteren, Knowles noted that claim construction was critical; under the proper claim construction, a "package is mechanically and electrically connected to a printed circuit board" through a mounting mechanism. Appx2784. The Halteren assembly, however, fails to disclose any mounting mechanism and instead discloses only a "connector adapted to contact" exposed electrical conductors (or contact pads) on the "distal end of flexible member 40." Appx2784-2785.

Halteren fails to "disclose any mechanism for securing end portion 45," which contains the transducer, to another device. Appx2785. Unlike "ordinary packages, where the pins and pads are either on the perimeter of the body of the package or on the underside of the body of the package," the sole means of connection to an external device in the Halteren assembly (*i.e.*, contact pads) are on the opposite end of the flexible substrate from the transducer (which is the very object that a microphone package is supposed to protect). *Id.* That is, the Halteren assembly is not and was not intended to be a "package."

As to obviousness, Knowles noted that the Examiner fundamentally erred by premising his rejections on "modifications and/or combinations [of prior art] that one of ordinary skill would not have found reasonable at the time of Minervini's invention." Appx2790. Knowles noted that "the rationale for combining references cited by the examiner requires both a finding that the elements are capable of being combined and a finding of an expectation that the combination would work for its intended purpose." Appx2800. The Examiner, however, made no such finding. Appx2801. The Examiner's combination assertion was, thus, wholly unsupported. Knowles further noted, in any event, that there is no basis for such a

combination, even had such a finding been issued. *Id.* On September 17, 2014, the Examiner filed his answer and simply incorporated his prior Right of Appeal Notice by reference. Appx2966.

The Board held an oral hearing on August 5, 2015, addressing these issues again. Appx3050. On August 18, 2015, Knowles submitted a notice of supplemental authority to apprise the Board of this Court's August 12, 2015 decision in *Power Integrations, Inc.*, 797 F.3d at 1327. Appx3009-3027. As Knowles explained in its notice of supplemental authority, "*Power Integrations* supports Knowles' contention that the examiner must address <u>and</u> apply *MEMS Technology's* interpretation of the claim term 'package,'" "or at the very least set out sufficiently detailed reasoning to persuasively distinguish these prior judicial holdings," with Knowles requesting "that this matter . . . be remanded for the examiner to do so." Appx3010.

### D.    The Board's Decision

On August 31, 2015, the Board issued its Decision and affirmed the Examiner's anticipation rejections based on Halteren and his obviousness rejections based on Halteren and Une. Appx1-19. The Decision's reasoning, which would later be reworked on rehearing, reflected some confusion.

At the outset, the Decision notes there are two "disputed [claim]
limitations": the "package" limitation of claim 1 and the "attaching a
plurality of silicon condenser microphone dice" limitation of claim 21, as
well as a limitation for dependent claim 22.  Appx4; Appx5 (emphasis
omitted).  The Board noted three aspects of Knowles's construction of
"package": (1) "[i]n view of both intrinsic and extrinsic evidence, Patent
Owner advocates the following claim construction:  '. . . an enclosure for a
device or circuit that provides (a) protection from mechanical and
environmental stress, (b) a first-level interconnect between the enclosed
device/circuit and the package, and (c) *a second level interconnect between the
package and an external printed circuit board,*'" Appx7-8; (2) "Patent Owner
further argues that . . . 'the second-level connection must be made <u>one of
two ways</u>, either (a) by inserting the package pins into the plated through-
holes of a printed circuit board and then soldering them into place or (b) by
placing specially-configured pins or pads onto corresponding 'lands' on
the top surface of the printed circuit board and then soldering them in
place,'" Appx8-9; and (3) "Patent Owner further argues that . . . 'a package
is mechanically and electrically connected to a printed circuit board by
either through-hole or surface mounting,'" Appx12.

42

Regarding Knowles's foregoing "package" arguments, the Board made three statements in response.  First, the Board noted that Knowles had submitted "several technical references as evidence providing a definition for 'package.'"  Appx8.  The Board then stated: "In particular, one relevant definition of 'package' which refers to a 'second level interconnect' is as follows: 'We can think of the package as a structure consisting of a semiconductor device, a first-level interconnect system, a wiring structure, *a second-level interconnection platform*, and an enclosure that protects the system and provides the mechanical platform for the sublevel.'"  *Id.* (emphasis added by the Board) (quoting Harper Handbook). Without addressing the other portions of the Harper Handbook cited by Knowles, let alone the other technical references defining the term "package" that Knowles submitted, the Board then stated: "Although this definition generally refers to a 'second-level interconnection platform,' such definition does not expressly require the second-level interconnect to be connected to a printed circuit board."  *Id.*  It is unclear from the Board's compound sentence as to whether the Board was rejecting the notion that a package requires a second-level interconnect, that it requires a connection to a printed circuit board, or both.

Second, the Board put forth an odd argument regarding one packaging treatise cited by Knowles. With regard to the explanation in *Fundamentals of Microsystems Packaging* 67 (Rao R. Tummala ed., McGraw-Hill 2001) that, "*[i]n general*, IC packages can be classified into two categories: 1) through-hole, and 2) surface mount," the Board put all weight on the term "*in general*" and gave it an odd reading. Appx9. Rather than address the packaging treatise's explanation that there are "two categories" through which connections are made, nor recognize that Tummala was noting the ability to divide "in general" a diverse group of packages into two categories, the Board concluded that, based upon the words "in general," there must not be two such categories: "Because the phrase 'in general' modifies the remainder of the sentence describing IC packages, Tummala does not support" the conclusion that "all-second-level connections" for the inventor's package were "to be either a through-hole mount or a surface mount." *Id.* The Board surmised that there could be "possible exceptions," *id.*, but left unsaid what such exceptions it contemplated.

Finally, the Board offered a puzzling reading of the intrinsic record. The Board stated: "Moreover, the '049 patent provides several references to

a printed circuit board including the following." *Id.* The Board followed

this statement with two block quotes that appear to demonstrate some

technical confusion by the Board. The first is a reference to Col. 6, ll. 37-42,

indicating that the bottom of the inventor's package contains "*solder pads 70*

*for electrical connection to an end user's board*." Appx9. That is, the written

description describes precisely what Knowles noted the inventor

contended in claiming a "package": a second level interconnect between

the package and an external printed circuit board, in this case using solder

pads, which are used for surface mounting, *i.e.*, one of the two categories

extensively discussed above, for forming an electrical and mechanical

connection.

The Board's second reference to the written description refers to the

"'package *mounting* orientation,'" *id.* (quoting col. 7, ll. 38-43) (emphasis

added), explaining that there is a "'*connection to the end user's board*,'" *id.*

(emphasis in original), made through this "'package *mounting*,'" *id.*

(emphasis added). Mounting, again, entirely supports Knowles's

construction of the inventor's claimed package. The Board then goes on to

quote portions of the written description addressing "[c]onnection from the

transducer 58 to the plated through holes," Appx9-10 (quoting Col. 7, ll. 48-

45

43); this references connection of the device *inside* of the package, and not the *second-level,* exterior connection of the package to a user's printed circuit board, *i.e.*, a motherboard in a system. But this intrinsic evidence once again supports that there are two manners (through-hole and surface mounting) of interconnecting with a package. Rather than recognizing that the intrinsic evidence was consistent with the extrinsic evidence regarding the ordinary meaning of the term "package," the Board disregarded it entirely, deeming it not "express language." Appx10.

The Decision then proceeds to simply state as its holding on claim construction: "Thus, the claim construction advocated by Patent Owner is unpersuasive because such an interpretation of 'package' that requires 'a second level interconnect between the package and an external printed circuit board' is overly narrow and unsupported by both intrinsic and extrinsic evidence." *Id.* The Board again utilizes a compound sentence that does not make explicit whether it is rejecting that a "package" must be connected to a second-level or whether a "package" is connected to a user's printed circuit board. Moreover, the Board's Decision does not undertake to provide a construction of "package" — which was, as page three of the Decision noted, the fundamental dispute before the Board.

Regarding *MEMS Technology*, despite Knowles's reliance upon

*MEMS Technology* in its briefing and in its notice of supplemental authority

regarding *Power Integrations*, the Board declined to cite or address it

substantively, other than to state in a footnote: "Patent Owner's

supplemental citation to *Power Integrations . . .* has been considered[,]"

Appx18 n.1, and that "Patent Owner's argument with respect to

Baumhauer has been rendered moot," because the Board did not address a

rejection based upon that reference. *Id.* It is unclear, but to the extent this

is a reference to *MEMS Technology*, it misapprehends the decision as being

solely related to the Baumhauer reference, as Knowles explained. *See*

Appx3056-3058.

As to the anticipation rejection, the Board recognized that Halteran is

an "assembly." Appx10. The Board declined once again to offer a claim

construction for "package," and instead stated that Halteren discloses a

"flexible member 40 connecting transducer assembly 10 to electronic

equipment." Appx11. The Board then mixed together various claim

construction issues into a compound sentence: "Patent Owner further

argues that 'using the proper meaning of 'package,' one of ordinary skill

would not view [Halteren] as a 'package' because it lacks a package's

second-level connection' and 'a package is mechanically and electrically connected to a printed circuit board by either through-hole or surface mounting,'" Appx12 (citation omitted), and then stated a compound conclusion: "However, as discussed previously, Patent Owner's interpretation of 'package,' which requires 'a second level interconnect between the package and an external printed circuit board' is overly narrow and unsupported by both [the] intrinsic and extrinsic evidence." Appx12.  The Board, like the Examiner, did not address Knowles's point that Halteren fails to "disclose any mechanism for securing end portion 45," which contains the microphone die, to another device.  *Compare* Appx2785, *with* Appx10-12.

As to the obviousness rejections, the Board affirmed the Examiner's "determination" that it "[i]t would have been obvious ... to use the silicon condenser microphone of Halteren in Une's invention because the substitution of one known element for another would have yield predictable results."  Appx13 (citation omitted).  In response to Knowles's having challenged the Examiner's lack of findings, the Board developed a new rationale for combining Halteren with Une.  Specifically, the Board theorized that "because silicon microphone 61 of Halteren sends output

48

signals to ASIC 62 and solid state device 8 of Une converts capacitance measured from electret capacitor microphone, both Halteren and Une apply similar modes of operation by converting measured vibration into electrical signals."  Appx14.  No remand was provided for Knowles to introduce evidence in opposition to such an obviousness approach. Instead, the Board utilized its new rationale to affirm.

On September 29, 2015, Knowles filed a timely request for rehearing. Appx3076-3089.  Knowles argued that the Board should grant rehearing for reversal or remand to the Examiner for several reasons, including: (1) the Board did "not actually construe the term" package, but instead simply disagreed with Knowles's construction and disregarded the substantial evidence in support of its construction, Appx3083; (2) the Board "overlook[ed] a pertinent Federal Circuit decision," *MEMS Technology*, "about the meaning of the term 'package,'" and under *Power Integrations*, "[t]hat is legal error," Appx3083-3084; and (3) the Board erred when it did "not defend the Examiner's cursory obviousness assertion" but instead "articulate[d] a new rationale for obviousness based on the Board's new finding that the microphones of Une and Halteren 'apply similar modes of

operation by converting measured vibration into electrical signals.'"
Appx3086 (citation omitted).

On February 18, 2016, the Board issued its Rehearing Decision, Appx20-33, denying rehearing. In response to Knowles noting that detailed evidence requires Knowles's construction of "package," the Board again stated a conclusion in a compound sentence that does not make explicit whether it disagrees that a "package" must have a second-level connection, whether it disagrees that a "package" is connected to a user's printed circuit board, or disagrees with both: "At best, extrinsic evidence submitted by Patent Owner illustrates that a secondary connection to a printed circuit board is a common practice, rather than an absolute requirement." Appx23. The Board thus acknowledged this "common" understanding that a package provides a secondary connection to a printed circuit board, but appeared to give it no weight.

The Board then reiterated its odd contention that the Tummala reference may contemplate more than "two categories" of second-level connections because Tummula prefaced its discussion with the words "in general." Appx24-25. The Board asserted that it is not "unreasonable" to assume, without citing evidence, that there are more than two categories.

50

Appx25.  The Board then stated that it is not "the Board's burden to prove a

negative," apparently regarding further support for its construction.  *Id.*

Finally, the Rehearing Decision noted Knowles's significant concern

that the Board had declined to construe "package"—what had been the

essence of the dispute—and instead "implicitly attempt[ed] to apply an

interpretation of 'package' . . . as encompassing Halteran's 'flexible

substrate transducer assembly'" despite "'Halteren's failure to provide a

way to mechanically attach the device to a circuit board.'"  Appx25-26.  The

Board then block quoted one portion of its prior decision and appeared to

suggest that the Board had, in fact, construed "package" based on a

sentence from the Harper Handbook:

> In particular, one relevant definition of "package" which
> refers to a "second level interconnect" is as follows:
>
>> We can think of the package as a structure
>> consisting of a semiconductor device, a first-level
>> interconnect system, a wiring structure, a second-
>> level interconnection platform, and an enclosure
>> that protects the system and provides the
>> mechanical platform for the sublevel.

Appx26.  The Board stated that "based upon this definition, we construed

the claim term 'package' as broad enough to encompass the transducer

assembly 10 of Halteren," *id.*, apparently suggesting that the Board's

Decision adopted a construction for "package," as opposed to the Rehearing Decision adopting this definition.

The Rehearing Decision did not address further pages of the Harper Handbook, however, which go on to explain that "packages come in a variety of . . . mounting types that are grouped into families defined by the method of mounting to level 2 [through-hole (TH) or surface-mount (SM)]," *see* Appx3081 (emphasis omitted)—consistent with all of the other evidence Knowles cited.

Regarding *MEMS Technology*, the Board finally engaged, but said little.  The Rehearing Decision states: "this Federal Circuit decision is not germane to the current appeal because the court did not adopted [sic] a claim construction that requires 'a second level interconnect between the package and an external printed circuit board.'"  Appx26-27.  Once again, the Board used a compound sentence that prevents the reader from understanding whether it is objecting to the "second-level" interconnect or connection to an external printed circuit board.

Finally, in response to Knowles's argument that the Board articulated a new rationale for the Examiner's obviousness rejections, the Board asserted that its citation to "different portion[s]" of an "applied reference,"

52

merely "elaborates upon" the Examiner's rejections.  Appx28.  Specifically, the Board contended that when the Examiner stated that the Une reference was a "condenser microphone" and that the Halteren reference was a "silicon condenser microphone," Appx28, this was sufficient for the Board, in its view, to issue an obviousness finding during administrative appellate proceedings, without providing a remand, that: "silicon microphone 61 of Halteren sends output signals to ASIC 62 and solid state device 8 of Une converts capacitance measured from electret capacitor microphone," such that "both Halteren and Une apply similar modes of operation by converting measured vibration into electrical signals."  Appx29.

Although Knowles requested a remand to develop a record in response to this appellate finding, noting, among other things, that "[t]he Board's new finding . . . overlooks that electret microphones rely on a charged backplate whereas MEMS microphones rely on biasing voltage and therefore require additional circuitry within the package, *i.e.*, a *different* mode of operation," the Board responded that Knowles's arguments regarding its new obviousness finding could not be considered because they were "new arguments not raised in the [initial] Briefs before the Board."  Appx29-30.  In other words, it was a Catch-22: by classifying its

new obviousness argument as merely being of the same "basic thrust of the rejection" where the Examiner indicated that one reference had a condenser microphone and another had a silicon condenser microphone, the Board held that Knowles waived the ability to argue against the Board's new rationale by not addressing it in briefing prior to the Board's creation of the argument. Further, the Board held that Knowles's arguments would require "evidence to support the argument that such combination would not have predictable results," Appx28, Appx30—in other words, Knowles would have to introduce evidence, but the Board declined to remand for Knowles to do so.

On March 21, 2016, Knowles timely appealed to this Court all of the Board's decisions and all underlying orders, rulings and opinions.

## SUMMARY OF ARGUMENT

The Board's Decision on Appeal ("Decision") affirming the Examiner's rejection of the claims requires vacatur and remand for at least three reasons. *First*, the Board failed to proffer its own construction of the disputed term "package" and instead merely disagreed with Knowles's proffered claim construction. To the extent the Board adopted a claim

construction upon rehearing, that construction itself remained vague and failed to engage with claim construction issues before the Board.

*Second,* the Board failed to address—much less explain its departure from—this Court's holdings in *MEMS Technology* regarding the construction of "package" in related patents by the same inventor. The Board's disregard of the Court's construction, as well as other relevant intrinsic and extrinsic evidence, requires a remand to apply *MEMS Technology* or, at the very least, consider it. The Board's incorrect claim construction approach resulted in a flawed anticipation finding that an "assembly"—a microelectronics device prior to packaging—constitutes a package.

*Finally*, where the Examiner utilized the method claims of the '049 patent as a roadmap to locate prior art in disparate fields for purposes of combination, the Board fundamentally erred in adopting a new rationale in support of obviousness at the administrative appeal stage, depriving Knowles of a fair opportunity to build a record in response.

# ARGUMENT

## I.    Standard of Review

"As a general matter," this Court "review[s] the Board's conclusions of law *de novo* and its findings of fact for substantial evidence." *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1297 (Fed. Cir. 2015).  When "the intrinsic record fully determines the proper construction," this Court "review[s] the Board's claim constructions *de novo*." *Id.*  While the Board's "underlying factual determinations involving extrinsic evidence" are reviewed for substantial evidence, *id.*, "'prior art cited in a patent or cited in the prosecution history of the patent constitutes *intrinsic evidence*.'"  *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (quoting *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003)) (emphasis added).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *In re Zurko*, 258 F.3d 1379, 1384 (Fed. Cir. 2001) (quotation marks omitted).

Obviousness is a question of law based on underlying facts. *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).  This Court "review[s] the Board's legal conclusion of obviousness *de novo*, and underlying factual findings for substantial evidence."  *In re Magnum Oil Tools Int'l*, ---F.3d ---,

No. 2015-1300, 2016 WL 3974202, at *11 (Fed. Cir. July 25, 2016).  An

obviousness finding must be supported by "articulated reasoning with

some rational underpinning to support a conclusion of invalidity based on

. . . combinations."  *InTouch Techs., Inc. v.VGO Commc'ns, Inc.*, 751 F.3d

1327, 1351 (Fed. Cir. 2014) (quotation marks omitted).  Such a finding

cannot be supported, however, by utilizing the patent-in-suit itself as a

"roadmap for putting . . . a 'jigsaw puzzle' together."  *Id.*

## II.  <u>Apparatus Claims</u>: The Board's Failure to Apply *MEMS Technology* and Related Evidence Requires Reversal or, at a Minimum, a Remand Pursuant to *Power Integrations*

Regarding the apparatus claims, the Board's failure to apply the

definition of "package" set forth in *MEMS Technology*, as well as the

corresponding consistent intrinsic and extrinsic evidence, compels reversal.

In the alternative, at a minimum, the Board must explain pursuant to *Power

Integrations* why it is warranted in disregarding *MEMS Technology*'s

construction of "package."

## A.    At the Outset, the Court Should Remand for Failure to Resolve the Basic Claim Construction Dispute

The Court should, at the outset, vacate and remand the Board's Decision because the Board has fundamentally failed to resolve critical claim construction disputes regarding the meaning of the term "package."

This Court's "mandate to 'review'" Board decisions "implies inherent power … to require that the Board's decision be capable of review." *Gechter v. Davidson*, 116 F.3d 1454, 1457 (Fed. Cir. 1997) (citing 35 U.S.C. § 141). "When the opinion explaining the decision lacks adequate fact findings, meaningful review is not possible, frustrating the very purpose of appellate review as well as this court's compliance with its statutory mandate." *Id.*; *see also Power Integrations, Inc.*, 797 F.3d at 1327 (vacating and remanding the Board's decision because it did not "permit meaningful appellate review"); *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1371 (Fed. Cir. 2005) (same, in the district court setting). Accordingly, a Board "opinion [that] lacks a claim construction" necessarily precludes meaningful judicial review. *Gechter*, 116 F.3d at 1460. The Board's "[c]laim construction must . . . be explicit, at least as to any construction disputed by parties . . . ." *Id.*

It is worth noting that the Examiner, unlike the Board, explicitly construed "package," yet neither the Board nor any party appear to expressly endorse that construction.  The Examiner construed "package" to mean: "an embodiment that provides environmental protection and electromagnetic shielding while *interconnecting the transducer microphone to an electronic system*."  Appx107-108 (emphasis added).  The Examiner expressly rejected inclusion of a second-level connection, concluding that "'how to connect the microphone die . . . to the outside world[]' [is] irrelevant to . . . claim interpretation" because the claims do not require "any second level interconnection."  Appx109.  The Examiner thus expressly—and incorrectly—rejected, *see* Appx107-109, this Court's analysis and decision in *MEMS Technology* requiring two levels of connection, *see* Appx3183-3184.

The Board's Decision never adopts the Examiner's construction, yet never explicitly rejects that construction either.  Indeed, a fair reading of the Board's Decision indicates that the Board does not adopt a construction for "package."  Instead, the Board jumps ahead to a broad invalidity approach, stating without analysis that the "flexible member 40 connecting transducer *assembly* 10 to electronic equipment" in Halteren constitutes a

"*package*."  Appx11 (emphasis added).  Absent the Board having performed

claim construction, however, there is no basis to support that conclusion.

The Board's Decision observed that Knowles raised three claim

construction disputes regarding "package."  *See supra* at 42.  While

recognizing that each of these claim construction issues were in dispute, *see*

Appx7-9, Appx12, the Decision ultimately does not take a position on

them.  The Decision instead merely states that the Board is rejecting as

"unpersuasive" an "interpretation of 'package' that requires 'a second level

interconnect between the package and an external printed circuit board.'"

Appx10.  That compound statement wholly failed to explain the basis for

the Board's disagreement.  Was the Board endorsing the Examiner's

construction, Appx107-108, that *no second-level interconnect* is required?  Or

was the Board disagreeing that the second-level interconnect is between the

package *and an external printed circuit board*?[1]  Most importantly, despite

noting Knowles's position, the Board does not resolve whether a "package"

---

[1] If so, the conclusion was unsupported, as Knowles had already indicated
that "the printed circuit board is not a requirement" because the term
"package" requires an apparatus that can be "mounted . . . onto *something
else like* a printed circuit board," *e.g.*, a "second level package."  Appx3058
(ll.1-10) (emphasis added).

requires mounting or provides for mechanical interconnection.  *See* Appx7-9, Appx12.  Absent the Board having provided its own construction in its Decision, the Court and Knowles do not know the Board's position.

The Board's Rehearing Decision does not cure the error.  The Board stated on rehearing that it had "construed the claim term 'package' as broad enough to encompass the transducer assembly 10 of Halteren," "based upon [a] definition" from the Harper Handbook.  Appx26.  Respectfully, a fair reading of the Board's Decision shows that it did not adopt the above sentence from Harper as being the Board's claim construction.  The Board's Decision identified this sentence in Harper as containing "one relevant definition of 'package' which refers to a 'second level interconnect.'"  Appx8.  Regardless, even the construction in the Rehearing Decision remains uncertain; in stating that, "based upon this definition, we construed the claim term 'package' as broad enough to encompass the transducer assembly 10 of Haltern [sic]," Appx26, the Board jumps immediately into invalidity without resolving the basic claim construction disputes between the parties.

The Board erred by failing to resolve "fundamental dispute[s] regarding the scope of a claim term." *O2 Micro Int'l Ltd. v. Beyond*

*Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). As this Court made explicit in *Gechter*, the Board cannot simply disparage a party's proposed construction while failing to resolve disputed claim construction issues. *Gechter*, 116 F.3d at 1460; *see also CSR, PLC v. Skullcandy, Inc.*, 594 F. App'x 672, 678 (Fed. Cir. 2014) ("Without a construction of the term, it is impossible to review the Board's findings."). Because the Board failed to offer a "[c]laim construction [that is] explicit" regarding "package" — which is a term "disputed by the parties" — its Decision must be vacated. *Gechter*, 116 F.3d at 1460.

### B.    The Board Erred by Failing to Apply *MEMS Technology* and Related Evidence

Should the Court proceed further, the Court should direct the Board to adopt the definition of "package" in *MEMS Technology* and follow the analysis therein, construing "package" to require a second-level connection with a mounting mechanism.

*First*, the Board fundamentally erred in ignoring the analysis and work done in *MEMS Technology* regarding closely related and contemporaneous patents. That is particularly so where, as here, *MEMS Technology* is part of the intrinsic record for the '049 patent. *MEMS*

*Technology* was before the original Examiner when the '049 patent was obtained.  *See* Appx156 (listing *MEMS Technology* on the patent); Appx667-668; Appx2787; Appx2791-2792; Appx2814.  As a matter of law, a skilled artisan knows what the inventor meant by "package"—it is listed in the *MEMS Technology* opinion submitted during prosecution, with that decision being listed on the patent.

The Board's failure to apply, let alone consider, this intrinsic evidence violates this Court's precedent that the "PTO should . . . consult the patent's prosecution history in proceedings in which the patent has been brought back to the agency for a second review."  *Proxyconn*, 789 F.3d at 1298.  As a matter of law, in construing "package," the Board should have read *MEMS Technology* and concluded that a "package" in the preamble of a claim requires a "self-contained unit that has two levels of connection, to the device and to a circuit (or other system)," Appx3184 (citations omitted), and that unit must be "mountable," Appx3174.  Having failed to review and apply intrinsic evidence, *see V-Formation, Inc.*, 401 F.3d at 1311, that failure is subject to *de novo* review, *see Proxyconn*, 798 F.3d at 1297.  As a matter of law, the definition of "package" set forth in *MEMS Technology* applies.

The cursory discussion of *MEMS Technology* in the Board's Rehearing Decision is no cure. The Rehearing Decision recited the holding from *MEMS Technology* that "the components listed in the claim body come together to form a *mountable package*," but failed to apply or distinguish this holding in any way. Further, the Board's belated acknowledgment of *MEMS Technology* cannot be used as a post-hoc justification for its plainly erroneous approach to claim construction in its Decision. *See Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1148 (D.C. Cir. 2013) ("[W]e are reluctant to affirm based on a factual assertion raised for the first time in an agency's denial of a petition for reconsideration when the agency had an opportunity to raise that point at an earlier point . . . .").

*Second*, the Board fundamentally did not understand nor properly engage with the specification, which makes explicit that the inventor was creating a "package" for the purpose of mounting to form a second-level connection. *See, e.g.*, Appx179 (7:39-43) ("The package *mounting* orientation is either top portion 48 down or bottom portion 50 down.") (emphasis added); Appx178 (5:29-32) ("The package would look and act the same whether it is *mounted* face up or face down, or the package could be

*mounted* to provide directional microphone characteristics.") (emphasis added).

The specification is not describing an assembly of parts prior to packaging. Instead, the purpose of the claimed package was to develop a product whereby, in "the final form of the product," "a silicon condenser microphone package . . . would most likely be attached to an end user's PCB . . . via a solder reflow process." Appx177 (4:8-10); *see also* Appx2776 ("The specification describes how solder pads on the exterior of the package housing are used to make the electrical connection between the package and an external device, for example, '[t]he bottom portion further comprises *solder pads 70 for electrical connection* to an end user's board.'") (quoting '049 patent, 6:40-42) (emphasis added); *see also* Appx158, fig. 4, Appx177 (3:55-56, describing how a microphone package 10 is "surface mount[ed] to a user's 'board' 28").

The Board never engages with the intrinsic evidence, describing citations to the inventor's microphone package as being mere "embodiments" that do not provide "express language to support Patent Owner's Interpretation of 'package' that requires 'a second level interconnect between the package and external printed circuit board.'"

Appx10.  The Board's misunderstanding of the embodiments at issue is

perhaps best exemplified by its statement that "[t]he '049 patent contains

thirty-one figures, illustrating multiple embodiments, in which only two

figures illustrate a package connected to a printed circuit board."  Appx22.

There is no basis for this statement.  The figures of the '049 patent

show, quite directly, various silicon condenser microphone packages with

different mounting orientations, as well as materials used in the

construction of such packages.  Figures 4 and 5 show the final step of

installing such packages on a user's printed circuit board 28, which is

described repeatedly in the written description as applying to various

figures, *e.g.*, Appx177 (3:57-59); Appx178 (6:40-42); Appx179 (7:12-13, 7:24-

25, 7:31-32, 7:38-39).  As the written description indicates, "[t]he present

invention is directed to microphone packages," Appx177 (3:10),  and "Figs.

4 and 5," contrary to the Board's assertion that they represent exceptions,

show "the final form of the product," in which "a silicon condenser

microphone package . . . would most likely be attached to an end user's

PCB . . . via a solder reflow process."  Appx177 (4:8-10).  *MEMS Technology*

makes this same point explicitly, based upon similar disclosures in the

specification of the '231 patent.  *See* Appx3173-3174 ("the specification

describes mounting the MEMS 'packages' of the invention on end-users' printed circuit boards ('PCBs')").  At base, the Board fails to engage with the intrinsic evidence, which requires Knowles's construction.

*Third*, the Board's rehearing construction is fatally flawed.  Even if the Board's interpretation of the extrinsic evidence were correct—and it is not—the Board would have erred by "rel[ying] on extrinsic evidence that contradicts the intrinsic record."  *Ruckus Wireless*, 824 F.3d at 1003.

*Fourth*, the extrinsic evidence, fairly reviewed and understood, completely supports *MEMS Technology* and Knowles's construction.  It is telling that the Rehearing Decision, in citing one portion of the Harper Handbook, did not address a further portion of the Harper Handbook that was before the original Examiner, Appx155, which goes on to explain that "packages come in a variety of . . . mounting types that are grouped into families defined by the method of mounting to level 2 [through-hole (TH) or surface-mount (SM)]," *see* Appx3081 (emphasis omitted), consistent with all of the other evidence Knowles cited.

Nor did the Board consider the context surrounding the one sentence that it isolated from the Harper Handbook.  The sentence that the Board adopted states that a package must provide a "*mechanical* platform for the

sublevel," and the next sentence explains that a "critical attribute[] provided by most packages [is] *geometric/mechanical translation*." Appx712 (emphasis added). As the Harper Handbook explains, mechanical translation is important because the "package bridges . . . two vastly different worlds," *i.e.*, "the 'inorganic' world of the IC and the 'organic' domain of most PCBs." *Id.* This accords with the intrinsic evidence portion of the Harper Handbook, which states that the "package provides *mechanical interfacing* for . . . electrical interconnection to the next level of packaging." Appx714-715 (emphasis added).

Moreover, the Board declined to engage with much of the other extrinsic evidence. The Board's statement at Appx23 is telling: "At best, extrinsic evidence submitted by Patent Owner illustrates that a secondary connection to a printed circuit board is a common practice, rather than an absolute requirement." *Id.* The Board appears to acknowledge that the extrinsic evidence identifies a "common" understanding of the term "package," and yet has not articulated any basis for concluding that the patent-in-suit rejects that understanding.

Although this Court's precedent requires the Board to construe claims based on "their *ordinary usage* as they would be understood by one

of ordinary skill in the art," *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997) (emphasis added), the Board here construed the claims to surmise exceptions from that common understanding, without record support. *See* Appx24-25 (surmising that the phrase "in general" means that packages exist outside the two categories consistently described in packaging treatises, while failing to provide any evidence of such a package). But the broadest-reasonable construction rubric "does not give the PTO an unfettered license to interpret claims to embrace anything remotely related to the claimed invention." *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1260 (Fed. Cir. 2010). The Board's construction "cannot be divorced from the specification and the record evidence," *NTP*, 654 F.3d at 1288, and "must be consistent with the one that those skilled in the art would reach," *In re Cortright*, 165 F.3d 1353, 1358 (Fed. Cir. 1999). Here, it is not.

The extrinsic evidence Knowles submitted makes explicit that the very purpose of a package is to provide for mounting. Specifically, the submitted packaging treatises consistently show that skilled artisans at the time of the invention recognized two categories of mounting types for packages, through-hole and surface mount, from the broader universe of packages:

- "IC packages come in a variety of . . . mounting types that are grouped into families defined by the method of mounting to level 2 [*through-hole* (TH) or *surface-mount* (SM)] . . . ."  Harper Handbook (emphasis added), Appx715.

- "In general, IC packages can be classified into two categories: 1) ***through-hole***, and 2) ***surface mount.*** These two categories refer to the methodology used in assembling the packages to the printed wiring board (PWB).  If the packages have pins that can be inserted into holes in the PWB, they are called through-hole packages.  If the packages are not inserted into the PWB, but are mounted on the surface of the PWB, they are called surface mount packages." *Fundamentals of Microsystems Packaging* (Rao R. Tummala ed., McGraw-Hill 2001) (emphasis added), Appx750.

- "There are two basic types of connections between the first- and second-level packages: those with pins, requiring ***plated-through-hole*** (PTH), and others with pins or pads meant for ***surface mounting*** the device (SMD) by the use of Surface Mounting Technology (SMT).  *All the available packages are*

70

*classified . . . into one of these categories.*"  *Microelectronics*

*Packaging Handbook* (Rao Tummala *et al.*, eds., 1989) (emphasis

added), Appx705.

- "The external connections of a chip carrier serve to classify the

    component into one of the two major technological categories:

    ***through hole*** components (THC) and ***surface mount***

    components.  For through hole components, the leads (external

    connectors) or pins are inserted through a common mounting

    surface.  For surface mount components, the chip carrier is

    connected directly to the mounting surface." *Handbook of*

    *Electronic Package Design* (Michael Pecht, ed., 1991) (emphasis

    added), Appx730.

- The "Printed circuit board (PBC) or next level interconnect

    approach" list two alternatives: "***Through-hole*** – Pins" and

    "***Surface mount*** – leads, pads, pins."  *Semiconductor Packaging*

    (Robert J. Hannemann *et al.*, eds., 1994) (emphasis added),

    Appx741.

The Board's error is compounded by its final effort to argue that it is

not "the Board's burden to prove a negative."  Appx25.  The fact that the

Board's construction amounts to a "negative" is precisely the problem;

claim construction is not the process of developing definitions that amount

to a negative, *i.e.*, that "interpret claims to embrace anything remotely

related to the claimed invention." *In re Suitco Surface, Inc.*, 603 F.3d at 1260.

The intrinsic evidence alone resolves this appeal and compels the adoption

of the definition of "package" set forward in *MEMS Technology*.

### C.    Alternatively, the Court Should Remand Pursuant to *Power Integrations* for the Board to Address *MEMS Technology*

In *Power Integrations, Inc. v. Lee*, this Court made explicit that, in

certain circumstances, the Board has an "obligation" to evaluate a previous

judicial interpretation of disputed claims "and to determine whether it [is]

consistent with the broadest reasonable construction of the term." 797 F.3d

at 1327. Those "circumstances" giving rise to the Board's obligation are

present when a party's "argument to the board about the proper

interpretation of" disputed claims are "tied" to a previous judicial

interpretation of those claims. *Id.* This is precisely such a case.

Like the appellant in *Power Integrations*, Knowles's construction of

the term "package" below "was expressly tied" to this Court's claim

construction in *MEMS Technology*. Even more so here, *MEMS Technology*,

its definition of "package," and the accompanying analysis are part of the intrinsic record and form the basis for the claims that were prosecuted and granted.  Appx156.  A skilled artisan would understand precisely the "package" at issue by looking no further than the face of the patent and its citation to *MEMS Technology*.

Knowles repeatedly invoked *MEMS Technology* before the Board, in noting that the term "package" requires a second-level connection with a mounting mechanism.  Appx2787-2790, Appx3053-3057, Appx3010, Appx3083-3084.  After this Court issued its decision in *Power Integrations*, Knowles filed a notice of supplemental authority, urging the Board to apply *MEMS Technology*, as directed by *Power Integrations*.  Appx3004-3006.

Despite Knowles's repeated requests that the Board adopt the definition of "package" in *MEMS Technology* and consider and address the Court's analysis and definition of "package," the Board did not cite, let alone discuss, *MEMS Technology* in its Decision, other than one possible allusion in a footnote.  *See* Appx1-19.  While the Board should apply the definition of "package" in *MEMS Technology*, it must first, as made explicit in *Power Integrations*, fairly review and evaluate *MEMS Technology*.  The Board's failure to do so is an independent reason to remand.

73

**D.    The Halteren "Assembly" Does Not Disclose a "Package"**

Assuming the Court does not remand based on the foregoing

independent grounds, in any event, the Halteren assembly does not

disclose a package.  Halteren lacks any mounting mechanism for

mechanical second-level connection.  As Knowles repeatedly explained,

Halteren "does not disclose any mechanism for securing end portion 45,"

which contains the microphone die, to another device.  Appx2785.  The

Halteren assembly instead discloses only a "flexible elongate member,"

Appx16, the distal end of which may be connected to another device.

Appx2785.  Neither the Board nor the Examiner ever disagreed with that

distinction between the two references.  Under the proper construction of

the term "package" as requiring a mountable second-level connection, the

Halteren "assembly" fails to disclose a "package."  Accordingly, the

Board's anticipation finding should be reversed.

## III.    <u>Method Claims</u>: The Board's New Obviousness Finding Requires Vacatur and Remand

The Board's decision must be vacated for the additional reason that it

"exceeded its limited role to review of the Examiner's decisions during

prosecution" when it offered a new ground for objection that was not

advanced by the Examiner, *Rambus Inc. v. Rea*, 731 F.3d 1248, 1255 (Fed.

Cir. 2013), resulting in fundamental prejudice to Knowles.

"Under the Administrative Procedure Act, the PTO must ensure that

the parties before it are fully and fairly treated at the administrative level."

*Id.* at 1255 (citation omitted).  In particular, the PTO must "provide prior

notice to the applicant of all 'matters of fact and law' asserted prior to an

appeal hearing before the Board.'"  *Stepan*, 660 F.3d at 1345 (quoting 5

U.S.C. § 554(b)(3)).  Accordingly, the "Board may not rel[y] on new *facts and

rationales* not previously raised to the applicant by the examiner."  *Rambus*,

731 F.3d at 1255 (quotation marks omitted; emphasis added).  Reliance on

new facts and rationales, without providing "the appellant . . .  an

opportunity to respond," "violates the appellant's notice rights and

warrants vacatur of the Board's decision."  *Id*. at 1256.  "Whether the Board

relied on a new ground of rejection is a legal issue" that this Court reviews

de novo.  *Id*.

The Examiner's obviousness analysis is extremely cursory.  Appx69-

70.  The Examiner does not look to various references for teachings that

direct a skilled artisan to other references, nor look to general-purpose

tutorials, nor look to general concepts known by skilled artisans.  Instead,

the Examiner quite literally starts with claim 21, concludes that Une meets various elements, and then looks to Halteren for no more reason than "Halteren (fig. 2A) shows a package including a silicon condenser microphone" and "the substitution . . . would have yield [sic] predictable results." Appx70.

No effort was made whatsoever to attempt to understand the time period in which the patent applications were filed, on November 28, 2000 and June 21, 2001. Nor did the Examiner articulate any rationale in support of obviousness, other than the bare reference to "substitution" based upon review of claim 21 and the submitted prior art. MEMS packaging was extremely challenging in this time period. *See supra* at 12-14; Appx2794-2795. As Tummala explains, "[d]ue to the variety of MEMS devices, it is not possible to specify a generic package." Appx2838. Other than the fact that the Examiner read claim 21 a decade and a half after the original applications, the Examiner presents no basis for how he was able to arrive at the formula set forth in the claim.

It is understandable that the Board would view the Examiner's analysis as inadequate. But the Board cannot issue a supplemental finding,

*see* Appx14, Appx28-29, without remanding and thereby providing Knowles an opportunity to submit an evidentiary response.

Specifically, the Board states that the Examiner referenced a "*condenser microphone*" reference and a "*silicon condenser microphone*" reference, Appx28 (emphasis in original), and that this entitled the Board to enter a finding that: "[B]ecause silicon microphone 61 of Halteren sends output signals to ASIC 62 and solid state device 8 of Une converts capacitance measured from electret capacitor microphone, both Halteren and Une apply similar modes of operation by converting measured vibration into electrical signals. Thus, we agree with Examiner (RAN 35) that modifying Une to incorporate silicon microphone 61 of Halteren would have been obvious." Appx14; *see also* Appx29.

This is not, as the Board put it, the same "basic thrust of the rejection" by the Examiner. Appx28 (citation omitted). The Board's finding does not appear anywhere in the Examiner's decision. The Examiner never compared Halteren's and Une's modes of operations in his obviousness determination. The Board's views regarding the operation, inputs, and outputs of Halteren and Une are nowhere to be found in the Examiner's rejections. The Board has plainly set forth on appeal "new facts and

rationales not previously raised to the applicant by the examiner," *Rambus*, 731 F.3d at 1255 (citation omitted), which Knowles has attempted to oppose given the procedures available on appeal and for which Knowles will vigorously oppose on remand through expert and fact evidence. This is precisely why such new grounds of rejection are required to be made before the Examiner. *See In re Leithem*, 661 F.3d 1316, 1320 (Fed. Cir. 2011) ("The thrust of the Board's rejection changes when . . . it finds facts not found by the examiner regarding the differences between the prior art and the claimed invention, and these facts are the principal evidence upon which the Board's rejection was based."); *In re Biedermann*, 733 F.3d 329, 339 (Fed. Cir. 2013) ( "To attempt to deny appellants an opportunity to provide a different and appropriate response to the board's rejection by saying that the board merely advanced 'an additional reason' for affirming the examiner begs the question and does not satisfy . . . administrative due process . . . .") (internal quotations omitted).

Nor does the fact that the Board relied on the same prior art references as the Examiner mean that the thrust of the Board's rejection is the same. "Mere reliance by the Board on the same type of rejection or the same prior art references relied upon by the examiner, alone, is insufficient

to avoid a new ground of rejection where it propounds new facts and rationales to advance a rejection—none of which were previously raised by the examiner." *Stepan*, 660 F.3d at 1345 (emphasis added).

Knowles sought rehearing regarding the Board's new rationale, noting that it was factually incorrect because the two types of microphones utilize different modes of operation. Specifically, "electret microphones rely on a charged backplate whereas MEMS microphones rely on biasing voltage and therefore require additional circuitry within the package." Appx3086-3087.[2] The Board declined to consider this argument, contending that it was a "new argument[] not raised in the Briefs before the Board." Appx30. This was a Catch-22; by classifying its new finding as being of the same "basic thrust of the rejection," the Board held that Knowles waived the ability to argue against the Board's new rationale by

---

[2] As explained in Gary W. Elko & Kieran P. Harney, *A History of Consumer Microphones: The Electret Condenser Microphone Meets Micro-Electro-Mechanical-Systems* (Apr. 2009)," the "modern electret microphone" was created by "metaliz[ing]' Teflon with a thin layer of aluminum" and "tensioning a charged Teflon membrane over a metalized backplate," Appx1631, Appx1633, *i.e.*, a "charged backplate." Appx3086. The mode of operation for MEMS microphones, by contrast, uses "bias voltage." Appx1637, Appx1643, Appx1661, Appx1664.

not addressing it in briefing prior to the Board's creation of the rationale. That is fundamentally unfair.

The Board's failure to afford Knowles administrative due process and insufficient basis for its obviousness conclusion requires vacatur and remand of its Decision.

## CONCLUSION

For the foregoing reasons, the Court should vacate the Board's decisions upholding the rejections of the challenged apparatus and method claims, and remand for further proceedings.

Respectfully submitted,

/s/ Brian G. Bieluch
Richard L. Rainey
Brian G. Bieluch
Michael S. Sawyer
Cyril Djoukeng
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 2001-4956
Tel: (202) 662-6000

## Proof of Service

I hereby certify that on September 12, 2016, the foregoing

APPELLANT KNOWLES ELECTRONICS, LLC'S PRINCIPAL BRIEF was

filed with the Clerk of the Court for the United States Court of Appeals for

the Federal Circuit using the appellate CM/ECF system which pursuant to

Federal Rule of Appellate Procedure 25(c)(2) and Federal Circuit Rule

25(c)(1) constitutes service on all parties represented by attorneys who

have registered for the CM/ECF system.


Dated:  September 12, 2016        By: /s/ Brian G. Bieluch
                                      Brian G. Bieluch

# Certificate of Compliance
# with Type-Volume Limitation, Typeface Requirements,
# and Type Style Requirements

The undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i).  The brief contains 13,851 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

The undersigned also hereby certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Book Antiqua type style, with 14-point or larger Book Antiqua type style headings.

As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C)(i), the undersigned has relied upon the word count of this word processing system in preparing this certificate.

Dated:  September 12, 2016          By: /s/ Brian G. Bieluch
                                        Brian G. Bieluch

# ADDENDUM



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,850 | 12/23/2011 | Anthony D. Minervini | 552689 | 6471 |

30954        7590        08/31/2015
LATHROP & GAGE LLP
2345 GRAND Boulevard
SUITE 2400
KANSAS CITY, MO 64108

| EXAMINER |
|---|
| ANDUJAR, LEONARDO |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/31/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

ANALOG DEVICES, INC.
Requester

v.

KNOWLES ELECTRONICS LLC
Patent Owner and Appellant
_____

Appeal 2015-004989
Reexamination Control 95/001,850
Technology Center 3900
Patent 8,018,049 B2
_____

Before JOHN A. JEFFERY, MARC S. HOFF, and ERIC B. CHEN,
*Administrative Patent Judges*.

CHEN, *Administrative Patent Judge*.

DECISION ON APPEAL

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

Patent Owner, Knowles Electronics LLC, appeals under 35 U.S.C.
§ 134(b) and 35 U.S.C. § 315(a) (pre-AIA) the Examiner's final decision to
reject claims 1, 2, 5, 6, 9, 11, 12, 15, 16, 19, 21–23, 25 and 26.  Claims 3, 4,
7, 8, 10, 13, 14, 17, 18, 20, and 24 are not subject to reexamination.

Third-Party Requester Analog Devices, Inc. did not file any
Respondent Briefs.

An oral hearing was held on August 5, 2015.  The record will include
a written transcript of the oral hearing in due course.

We have jurisdiction under 35 U.S.C. §§ 134 and 315 (pre-AIA).  We
affirm.


## STATEMENT OF THE CASE

A request for *inter partes* reexamination of U.S. Patent
No. 8,018,049 B2 (the '049 patent) was filed on December 23, 2011, by
Third-Party Requester Analog Devices, Inc., and assigned Reexamination
Control No. 95/001,850.

The '049 patent, entitled "Silicon Condenser Microphone and
Manufacturing Method," issued September 13, 2011 to Anthony D.
Minervini, based on Application No. 11/741,881, filed April 30, 2007.

The '049 patent is a divisional of Application No. 10/921,747 filed
August 19, 2004, now U.S. Patent No. 7,434,305, which is a continuation-
in-part of Application No. 09/886,854, filed June 21, 2001, now U.S. Patent
No. 7,166,910.

The '049 patent is assigned to Knowles Electronics LLC, the real
party in interest.

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

*Related Litigation*

The '049 patent has been asserted in *Knowles Electronics, LLC v. Analog Devices, Inc.*, No. 1:11-cv-6804 (N.D. Ill. Sept. 27, 2011) and *In the Matter of Certain Silicon Microphone Packages and Products Containing the Same*, No. 337-TA-825 (USITC Dec. 7, 2011). These cases have been terminated. (PO App. Br. 1.)

The '049 patent has also been asserted in *Knowles Electronics, LLC v. GoerTek, Inc.*, No. 1:13-cv-4586 (N.D. Ill. Jun. 21, 2013) and *In the Matter of Certain Silicon Microphone Packages and Products Containing Same*, No. 337-TA-888 (USITC Jun. 21, 2013). (*Id.*) These cases have also been terminated.

*The Claims*

Claims 1, 21, and 22 are exemplary, with disputed limitations in italics:

    1.    A silicon condenser microphone *package* comprising:

    a package housing formed by connecting a multi-layer substrate comprising at least one layer of conductive material and at least one layer of nonconductive material, to a cover comprising at least one layer of conductive material;

    a cavity formed within the interior of the package housing;

    an acoustic port formed in the package housing; and

    a silicon condenser microphone die disposed within the cavity in communication with the acoustic port;

    where the at least one layer of conductive material in the substrate is electrically connected to the at least one layer of

3

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

conductive material in the cover to form a shield to protect the
silicon condenser microphone die against electromagnetic
interference.

21.    A method of manufacturing a silicon condenser
microphone package comprising:

providing a panel comprising a plurality of
interconnected package substrates, where each of the plurality
of package substrates comprises at least one layer of conductive
material and at least one layer of non-conductive material;

*attaching a plurality of silicon condenser microphone
dice to the plurality of package substrates*, one die to each
package substrate;

attaching a plurality of package covers, each comprising
at least one layer of conductive material, to the panel, one
package cover to each of the package substrates, where
attaching the plurality of package covers to the panel comprises
electrically connecting the at least one layer of conductive
material in the package cover to the at least one layer of
conductive material in the corresponding package substrate to
form a shield to protect the silicon condenser microphone die
against electromagnetic interference; and

separating the panel into a plurality of individual silicon
condenser microphone packages.

22.    The method of claim 21, *where each of the
plurality of package substrates further comprises an acoustic
port.*

*The Rejections*

Patent Owner appeals the Examiner's decision to reject all the
pending claims as follows:

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

1.    Claims 1, 2, 5, 6, 9, 11, 12, 15, 16, and 19 stand rejected under
35 U.S.C. § 102(e) as anticipated by Halteren (US 6,324,907 B1; Dec. 4, 2001).

2.    Claims 1, 9, 11, 12, 15, 16, and 19 stand rejected under
35 U.S.C. § 102(b) as anticipated by Baumhauer (US 4,533,795; Aug. 6, 1985).

3.    Claims 1, 2, 5, 6, 11, 12, 15, 16, and 19 are rejected under
35 U.S.C. § 103(a) as obvious over Une (US 6,594,369 B1; July 15, 2003)
and Halteren.

4.    Claims 1, 2, 5, 6, 11, 12, 15, 16, and 19 are rejected under
35 U.S.C. § 103(a) as obvious over Une and Baumhauer.

5.    Claims 1, 2, 5, 6, 11, 12, 15, 16, and 19 are rejected under
35 U.S.C. § 103(a) as obvious over Une and Mullenborn (US 6,522,762 B1;
Feb. 18, 2003).

6.    Claims 1, 11, 12, 15, 16, and 19 stand rejected under 35 U.S.C.
§ 103(a) as obvious over Sjursen (US 7,003,127 B1; Feb. 21, 2006) and
Halteren.

7.    Claims 1, 11, 12, 15, 16, and 19 are rejected under 35 U.S.C.
§ 103(a) as obvious over Sjursen and Baumhauer.

8.    Claims 1, 11, 12, 15, 16, and 19 are rejected under 35 U.S.C.
§ 103(a) as obvious over Sjursen and Mullenborn.

9.    Claims 21–23, 25, and 26 stand rejected under 35 U.S.C.
§ 103(a) as obvious over Une and Halteren.

10.    Claims 21–23, 25, and 26 stand rejected under 35 U.S.C.
§ 103(a) as obvious over Une and Baumhauer.

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

11.    Claims 21, 25, and 26 stand rejected under 35 U.S.C. § 103(a) as obvious over Une and Mullenborn.

12.    Claims 22 and 23 stand rejected under 35 U.S.C. § 103(a) as obvious over Une, Mullenborn, and Halteren.

13.    Claims 21–23, 25, and 26 are rejected under 35 U.S.C. § 103(a) as obvious over Glenn '705 (US 6, 177,705; Sept. 12, 2000) and Halteren.

14.    Claims 21–23 and 26 are rejected under 35 U.S.C. § 103(a) as obvious over Glenn '705 and Baumhauer.

15.    Claims 21–23, 25, and 26 are rejected under 35 U.S.C. § 103(a) as obvious over Glenn '653 (US 6,526,653 B1; Mar. 4, 2003) and Halteren.

16.    Claims 21–23 and 26 are rejected under 35 U.S.C. § 103(a) as obvious over Glenn '653 and Baumhauer.

17.    Claims 21–23 and 26 are rejected under 35 U.S.C. § 103(a) as obvious over Carpenter (US 6,928,718 B2; Aug. 16, 2005) and Halteren.

18.    Claims 21–23 and 26 are rejected under 35 U.S.C. § 103(a) as obvious over Carpenter and Baumhauer.

Patent Owner relied upon the following declaration in rebuttal to the Examiner's proposed rejection:

> Declaration under 37 C.F.R. § 1.132 of Peter V. Loeppert, Ph.D., dated May 7, 2012 ("Loeppert Declaration" or "Loeppert Decl.").

## ANALYSIS

*Claim Interpretation*

In view of both intrinsic and extrinsic evidence, Patent Owner advocates the following claim construction:

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

> [O]ne of ordinary skill in the art, at the time of the Minervini
> invention, would understand that a "package" is, at a minimum,
> an enclosure for a device or circuit that provides (a) protection
> from mechanical and environmental stress, (b) a first-level
> interconnect between the enclosed device/circuit and the
> package, and (c) *a second level interconnect between the
> package and an external printed circuit board.*

(PO App. Br. 8 (emphasis added).)

To support this claim construction, Patent Owner has submitted
several technical references as evidence providing a definition for "package"
in the context of microelectronics, as interpreted by one of ordinary skill in
the art. (PO App. Br. 6–8.) In particular, one relevant definition of
"package" which refers to a "second level interconnect" is as follows:

> We can think of the package as a structure consisting of a
> semiconductor device, a first-level interconnect system, a
> wiring structure, *a second-level interconnection platform*, and
> an enclosure that protects the system and provides the
> mechanical platform for the sublevel.

(PO App. Br. 7 (quoting Ken Gilleo, ELECTRONIC PACKAGE &
INTERCONNECTION HANDBOOK 1.22 (Charles A. Harper ed., McGraw-Hill
3rd ed. 2000)) (emphasis added).)

Although this definition generally refers to "a second-level
interconnection platform," such definition does not expressly require the
second-level interconnect to be connected to a printed circuit board.
Accordingly, Patent Owner further argues that:

> the second-level connection – the broadest reasonable
> interpretation of a package, as viewed by one of ordinary skill
> in the art, is that the second-level connection must be made <u>one
> of two ways</u>, either (a) by inserting the package pins into the
> plated through-holes of a printed circuit board and then
> soldering them into place or (b) by placing specially-configured

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

> pins or pads onto corresponding "lands" on the top surface of
> the printed circuit board and then soldering them in place.

(PO App. Br. 9–10.) To support this argument, Patent Owner

provides a citation to another technical reference, which states that

"*[i]n general*, IC packages can be classified into two categories: 1)

through-hole, and 2) surface mount." (PO App. Br. 10 (quoting

FUNDAMENTALS OF MICROSYSTEMS PACKAGING 67 (Rao R. Tummala

ed., McGraw-Hill 2001) (emphasis added).) Because the phrase "in

general" modifies that remainder of the sentence describing IC

packages, Tummala does not support Patent Owner's argument

requiring all second-level connections to be either a through-hole

mount or a surface mount. Instead, the phrase "in general" means that

in most instances, the second-level connections can either be a

through-hole mount or a surface mount, but permits for possible

exceptions.

Moreover, the '049 patent provides several references to a printed

circuit board including the following:

> Referring to FIG. 15, an embodiment of the bottom
> portion 50 is illustrated. The bottom portion 50 of this
> embodiment includes a solder mask layer 68 and alternating
> layers of conductive and non-conductive material 44, 46. *The
> bottom portion further comprises solder pads 70 for electrical
> connection to an end user's board.*

(Col. 6, ll. 37–42 (emphasis added).) In another embodiment, microphone

package 40 (col. 7, ll. 5–6) is disclosed as follows:

> In FIG. 26, *connection to the end user's board is made
> through the top portion 48 or the bottom portion 53*. The
> package mounting orientation is either top portion 48 down or
> bottom portion 50 down. Connection from the transducer 58 to

8

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

> the plated through holes is made by flip chipping or wire
> bonding and trace routing.

(Col. 7, ll. 38–43 (emphasis added).)  However, neither embodiment
provides express language to support Patent Owner's interpretation of
"package" that requires "a second level interconnect between the package
and an external printed circuit board."  Thus, the importation of a narrow
embodiment into the broader independent claim 1 is improper. *See*
*SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir.
2004) ("For example, a particular embodiment appearing in the written
description may not be read into a claim when the claim language is broader
than the embodiment.")

Thus, the claim construction advocated by Patent Owner is
unpersuasive because such an interpretation of "package" that requires "a
second level interconnect between the package and an external printed
circuit board" is overly narrow and unsupported by both intrinsic and
extrinsic evidence.

## *§ 102 Rejection—Halteren*

The Examiner found that the flexible substrate transducer assembly of
Halteren corresponds to the limitation "package," as recited in independent
claim 1.  (RAN 6.)  We agree with the Examiner's determination.

Halteren relates to a flexible substrate transducer assembly, in
particular, an electro-acoustic transducer.  (Col. 1, ll. 5–7.)  Figure 2A of
Halteren illustrates flexible substrate transducer assembly 10, including
silicon microphone 61 and Application Specific Integrated Circuit (ASIC)
62 mounted on flexible member 40 (col. 7, ll. 52–57) and "[metal] lid 70

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

[that] covers the transducer system and shields it from the external environment" (col. 8, ll. 11–13). Halteren explains that "the lid function[s] as an EMI shield that effectively shields the transducer system and the generated transducer signals from interfering electromagnetic signals of the external environment." (Col. 3, ll. 50–53.) Figure 2A, a cross-sectional view of transducer assembly 10, is reproduced below:



FIG. 2A

Halteren explains that ASIC 62 receives output signals from silicon microphone 62 (col. 7, ll. 54–55) and that flexible member 40 includes four electrical conductors 20–23 to provide electrical connections to a piece of electronic equipment (col. 7, ll. 30–36). Because Halteren explains that transducer assembly 10 includes the features of: (i) ASIC 62 receiving output signals from silicon microphone 61; (ii) metal lid 70 shielding transducer assembly 10 from the external environment, including interfering electromagnetic signals; and (iii) flexible member 40 connecting transducer assembly 10 to electronic equipment, Halteren discloses the limitation "package," as recited in claim 1.

Patent Owner argues that:

Inasmuch as the original examiner was provided not only with the prior art references themselves, but also with the analysis of the prior art references by the ITC [International Trade

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

> Commission] and the arguments raised by the Requester in the
> ITC proceeding, the original examiner's allowances over these
> references are reliable and should not be disturbed.

(PO App. Br. 16.)  To the extent Patent Owner is arguing that the

Examiner's determination with respect to a substantial new question of

patentability based on Halteren was improper, Patent Owner can seek review

by filing a petition to the Director, rather than appeal.  *See Belkin Int'l, Inc.*

*v. Kappos*, 696 F.3d 1379, 1382–83 (Fed. Cir. 2012).

Patent Owner further argues that "using the proper meaning of

'package,' one of ordinary skill would not view [Halteren] as a 'package'

because it lacks a package's second-level connection" and "a package is

mechanically and electrically connected to a printed circuit board by either

through-hole or surface mounting."  (PO App. Br. 17.)  However, as

discussed previously, Patent Owner's interpretation of "package," which

requires "a second level interconnect between the package and an external

printed circuit board" is overly narrow and unsupported by both intrinsic and

extrinsic evidence.

Accordingly, we affirm the Examiner's decision to reject claims 1, 2,

5, 6, 9, 11, 12, 15, 16, and 19 under 35 U.S.C. § 102(e) as anticipated by

Halteren.

*§ 103—Une and Halteren*

Claims 21, 25, and 26

The Examiner acknowledged that Une does not disclose the limitation

"attaching a plurality of silicon condenser microphone dice to the plurality

of package substrates," as recited in independent claim 21 and, therefore,

11

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

relied on Halteren for teaching a silicon microphone. (RAN 34–35.) The

Examiner concluded that "[i]t would have been obvious . . . to use the silicon

condenser microphone of Halteren in Une's invention because the

substitution of one known element for another would have yield predictable

results." (RAN 35.) We agree with the Examiner's determination.

Une relates to "an electret capacitor microphone." (Col. 1, ll. 7–8.)

Une explains that such electret capacitor microphones are characterized by

> a thin diaphragm having a thin metal film facing toward an
> opening in a metal casing and a fixed electrode opposed thereto,
> and utilize the principal of a change in capacity between the
> diaphragm and the fixed electrode dependently on the vibration
> of the diaphragm due to a sound wave.

(Col. 1, ll. 10–15.) Figure 8 of Une illustrates an embodiment in which a

capacitor portion (i.e., electret capacitor microphone), including

diaphragm 4 and fixed electrode 6, and solid state device 8 are arranged in

parallel (col. 9, ll. 50–53), such that solid state device 8 converts changes in

capacity caused by a sound wave vibration into a voltage or current (col. 5,

ll. 5–10). Figure 8 of Une, a cross-section view of the capacitor portion

arranged in parallel with solid state device 8, is reproduced below:



*Fig.8*

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

Combining Une and Halteren is no more than the simple substitution of the known silicon microphone 61 of Halteren for the known electret capacitor microphone of Une, to yield predictable results. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). Moreover, because silicon microphone 61 of Halteren sends output signals to ASIC 62 and solid state device 8 of Une converts capacitance measured from electret capacitor microphone, both Halteren and Une apply similar modes of operation by converting measured vibration into electrical signals. Thus, we agree with the Examiner (RAN 35) that modifying Une to incorporate silicon microphone 61 of Halteren would have been obvious.

Patent Owner argues that:

> The Examiner offered no evidence to suggest that discrete microphone components are swappable for MEMS components, no explanation of how one of ordinary skill might go about engineering the proposed substitution, no explanation of what modifications to the die or case would be necessary to make the proposed substitution, and no evidence that the Une '369 casing is compatible in terms of size and materials to accommodate the MEMS die of [Halteren].

(PO App. Br. 34.) However, Patent Owner's argument is unpersuasive because it is based upon bodily incorporating silicon microphone 61 of Halteren, rather than the combined teachings of Halteren and Une. *See In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference . . . . Rather, the test is what the combined teachings of the references would have suggested to those of ordinary skill in the art.").

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

Patent Owner further argues that "Fig. 8 is [of Une] inoperable, and so one of ordinary skill in the art would be unlikely to use Fig. 8 as a starting point . . . in designing the silicon condenser microphone package . . . and would certainly have no reasonable expectation that the resulting device would function." (PO App. Br. 35; *see also id.* at 26.) To support this position, Patent Owner points to paragraphs 5–6 of the Loeppert Declaration. (*Id.*) A relevant portion of the Loeppert Declaration states:

> I have reviewed Une '369, and in particular, Figs. 6A and 8. In each of these figures, the capacitor is formed by elements 4 (the diaphragm) and 6 (the fixed electrode). In both figures, the fixed electrode [6] is flush against the bottom of the casing [1], leaving only the room between them for a back volume. Since the spacing must be very small to produce a usable capacitance value, it is unlikely that the disclosed non-MEMS microphone would function properly in this configuration, and if a MEMS condenser microphone transducer was used in this configuration, given its typically even smaller gap between the diaphragm and fixed electrode, it would almost certainly fail to function properly.

(Loeppert Decl. ¶ 6.) However, because Une is silent with respect to the scale of Figure 8, arguments based on measurement of the drawing features are of little value. *See Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000) ( "[I]t is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue."). Furthermore, the statements in the Loeppert Declaration relied upon by Patent Owner lack persuasive factual support because the Loeppert Declaration does not cite to sufficient corroborating evidence. *See In re*

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

*Beattie*, 974 F.2d 1309, 1313 (Fed. Cir. 1992) ("[D]eclarations themselves

offer only opinion evidence which has little value without factual support.").

Accordingly, we affirm the Examiner's decision to reject claims 21,

25, and 26 under 35 U.S.C. § 103(a) as obvious over Une and Halteren.


Claims 22 and 23

The Examiner found that the holes extending through the flexible

member of Halteren corresponds to the limitation "where each of the

plurality of package substrates further comprises an acoustic port," as recited

in dependent claim 22. (RAN 35–36.) We agree with the Examiner's

determination.

Halteren explains that "the supporting area of the flexible elongate

member [40] comprises one or several holes extending through the flexible

elongate member so as to provide a first passage to the external environment

between the lower surface of the member and the transducer system covered

by the lid." (Col. 2, ll. 52-56.) Halteren further explains that "silicon

microphone 61 is arranged with front side of its membrane facing the holes

and its backside facing a cavity 75 formed by the lid 70 and the flexible

member 40." (Col. 8, ll. 13–15.) Because Halteren explains that holes are

formed in flexible elongate member 40, Halteren teaches the limitation

"where each of the plurality of package substrates further comprises an

acoustic port."

Figure 2A of Halteren illustrates a microphone configuration in which

holes (i.e., the claimed "acoustic port") are formed in flexible elongate

member 40 (i.e. the claimed "package substrate"), rather than metal lid 70.

15

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

Accordingly, combining Une and Halteren is no more than the simple substitution of one known microphone configuration (i.e., holes are formed in flexible elongate member 40 of Halteren) for another known configuration (i.e., sound hole 21 in metal cover 2 of Une), to yield predictable results. *See KSR*, 550 U.S. at 417.

Patent Owner argues that "the Examiner offered no rationale for combining Une '369 with the acoustic port of [Halteren]" and "the Examiner assumes but does not support the conclusions that (a) an appropriate port can be made in the ceramic substrate of Une '369 . . . and (b) the port in the substrate wouldn't interfere with the position of the sound hole 21 in the cover 2." (PO App. Br. 35.) However, as discussed previously, the combination of Une and Halteren is based on the simple substitution of one known microphone configuration for another known microphone configuration.

Accordingly, we affirm the Examiner's decision to reject claims 22 and 23 under 35 U.S.C. § 103(a) as obvious over Une and Halteren.

## Other §§ 102 and 103 Rejections

We do not reach the rejections of: (i) claims 1, 9, 11, 12, 15, 16, and 19 under 35 U.S.C. § 102(b) as anticipated by Baumhauer; (ii) claims 1, 2, 5, 6, 11, 12, 15, 16 and 19 under 35 U.S.C. § 103(a) as obvious over various combinations of Une, Baumhauer, Mullenborn, Sjursen, and Halteren; and (iii) claims 21–23, 25 and 26 under 35 U.S.C. § 103(a) as obvious over various combinations of Une, Baumhauer, Mullenborn, Halteren,

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

Glenn '705, Glenn '653, and Carpenter.[1]  Affirmance of the rejections discussed previously renders it unnecessary to reach the remaining rejections, as all of pending claims have been addressed and found unpatentable.  *Cf. In re Gleave*, 560 F.3d 1331, 1338 (Fed. Cir. 2009) (not reaching additional obviousness rejections).

## DECISION

The Examiner's decision to reject claims 1, 2, 5, 6, 9, 11, 12, 15, 16, and 19 under 35 U.S.C. § 102(e) as anticipated by Halteren is sustained.

The Examiner's decision to reject of claims 21–23, 25 and 26 under 35 U.S.C. § 103(a) as obvious over Une and Halteren is sustained.

Requests for extensions of time in this *inter partes* reexamination proceeding are governed by 37 C.F.R. § 1.956.  *See* 37 C.F.R. § 41.79.

In the event neither party files a request for rehearing within the time provided in 37 C.F.R. § 41.79, and this decision becomes final and appealable under 37 C.F.R. § 41.81, a party seeking judicial review must timely serve notice on the Director of the United States Patent and Trademark Office.  *See* 37 C.F.R. §§ 90.1 and 1.983.

## AFFIRMED

---

[1] Patent Owner's supplemental citation to *Power Integrations, Inc. v. Lee*, No. 2014-1123, 2015 WL 4757642 (Fed. Cir. Aug. 12, 2015), filed August 18, 2015, has been considered.  However, Patent Owner's argument with respect to Baumhauer has been rendered moot, because we do not reach the additional rejections of claims under 35 U.S.C. §§ 102 and 103 as either anticipated by or obvious over Baumhauer, alone or in combination with various references.

17

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2


peb


<u>PATENT OWNER</u>:

LATHROP & GAGE LLP
2345 Grand Boulevard
Suite 2400
Kansas City, MO  64108

<u>THIRD PARTY REQUESTER</u>:

SUNSTEIN KANN MURPHY & TIMBERS LLP
125 Summer Street
Boston, MA  02110-1618



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/001,850 | 12/23/2011 | Anthony D. Minervini | 552689 | 6471 |

30954          7590          02/18/2016
LATHROP & GAGE LLP
2345 GRAND Boulevard
SUITE 2400
KANSAS CITY, MO 64108

| EXAMINER |
|---|
| ANDUJAR, LEONARDO |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 02/18/2016 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

ANALOG DEVICES, INC.
Requester

v.

KNOWLES ELECTRONICS LLC
Patent Owner and Appellant
_____

Appeal 2015-004989
Reexamination Control 95/001,850
Technology Center 3900
Patent 8,018,049 B2
_____

Before JOHN A. JEFFERY, MARC S. HOFF, and ERIC B. CHEN,
*Administrative Patent Judges.*

CHEN, *Administrative Patent Judge.*

DECISION ON REQUEST FOR REHEARING

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

On September 29, 2015, Patent Owner, Knowles Electronics LLC ("Patent Owner") requested rehearing under 37 C.F.R. § 41.79 (a) of the Decision on Appeal entered August 31, 2015 ("Decision" or "Dec."), which affirmed the Examiner's final rejection of claims 1, 2, 5, 6, 9, 11, 12, 15, 16, 19, 21–23, 25 and 26.

Third-Party Requester Analog Devices, Inc. did not file any comments under 37 C.P.R. § 41.79 (c) in opposition to Patent Owner's request for rehearing.

The Request for Rehearing is *denied*.


ANALYSIS

*Claim Construction*

First, Patent Owner argues that "[t]he Decision rejects . . . Knowles's proposed construction based on a determination that Minervini '049 lacks 'express language' limiting the term 'package' in this manner." (Req. for Reh'g 2.) However, Patent Owner argues, "the law does not require 'express language' in a specification to support requirements that are well-understood by a person skilled in the art." (*Id.*)

However, the Federal Circuit has articulated that "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc). The '049 patent contains thirty-one figures, illustrating multiple embodiments, in which only two figures illustrate a package connected to a printed circuit board. Furthermore, the '049 patent does not expressly define a "package"

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

as requiring a second level interconnect between the package and an external printed circuit board.  Accordingly, the intrinsic evidence of record does not persuasively establish that the claim term "package" must be construed as requiring "a second level interconnect between the package and an external printed circuit board," as advocated by Patent Owner.

Second, Patent Owner argues "the Board overlooks Knowles's argument that the term 'package' is a well-known term of art in the microelectronics industry." (Req. for Reh'g 2.)  In particular, Patent Owner argues that "[t]he Board's overly broad interpretation is simply not consistent with how one of ordinary skill would understand the term" and "Knowles submitted extensive evidence about the meaning of the term 'package,' and in particular how one of ordinary skill would understand the 'second-level connection' requirement for a 'package.'" (*Id.* at 3.)

However, Patent Owner has not provided any persuasive extrinsic evidence that requires "a second level interconnect between the package and an external printed circuit board."  In particular, Patent Owner has not provided a single technical reference to support the construction that a "package" requires "a second level interconnect between the package and an external printed circuit board."  At best, extrinsic evidence submitted by Patent Owner illustrates that a secondary connection to a printed circuit board is a common practice, rather than an absolute requirement.[1]

Third, Patent Owner argues "[t]he Board overlooked virtually all of this [extrinsic] evidence, and instead focused on an alleged flaw in one of

---

[1] In a related proceeding, the U.S. International Trade Commission reached a similar determination with respect to the claim construction of "package."

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

the references: Tummala Fundamentals." (Req. for Reh'g 4.) In particular,
Patent Owner argues "[w]hen read contextually, it is clear that the phrase [in
general] was used in Tummala Fundamentals to describe two overarching
categories or families of packages, while allowing for subcategories to exist
within each of those 'general' families." (*Id.* at 5.)

Although Patent Owner has offered an alternative interpretation of the
modifier "in general" from the sentence "[i]n general, IC packages can be
classified into two categories: 1) through-hole, and 2) surface mount" from a
technical reference (FUNDAMENTALS OF MICROSYSTEMS PACKAGING 67 (Rao

*In the Matter of Certain Silicon Microphone Packages and Products
Containing the Same*, No. 337-TA-695 (USITC Nov. 22, 2010). In
particular, the Administrative Law Judge concluded that:

> Based on the intrinsic and extrinsic evidence cited *supra*, I find
> that "package" means "a single, self-contained unit which fully
> encloses a device, and which provides: (1) protection for the
> device from the external environment, (2) an electrical
> connection between the device and the package, and (3) an
> electrical connection between the package and another circuit
> outside of the package."

(Slip. Op. 25.)

> Knowles argues that the second level connection can only be
> made in one of two ways: (1) "by inserting the leads of the first
> level package into plated holes in the board and soldering them
> into place" or (2) "by placing the first level package onto pads,
> which have been covered in solder paste, on the top surface of
> the printed circuit board." I find that the evidence of record
> demonstrates that these are two ways of forming the second level
> connection, but they are not the ***only*** two ways, as Knowles
> asserts.

(*Id.* at 26 (citations omitted.))

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

R. Tummala ed., McGraw-Hill 2001)), Patent Owner has not shown that our interpretation of the phrase "in general" as meaning, "in most instances, the second-level connections can either be a through-hole mount or a surface mount, but permits for possible exceptions" (Dec. 8) is unreasonable.

Fourth, Patent Owner argues "the Decision does not identify a single example of package mounting other than surface mounting or through-hole mounting" and "Requester's expert, Dr. Michael Pecht, could not substantiate any other example of package mounting." (Req. for Reh'g 5.)

However, the testimony of a single expert (e.g., Dr. Michael Pecht's alleged inability to "substantiate any other example of package mounting") does not persuasively rebut the express statement in the extrinsic evidence that "[i]n general, IC packages can be classified into two categories: 1) through-hole, and 2) surface mount" and accordingly, not all IC packages are required, without any exception, to have a second-level connections that is either a through-hole mount or a surface mount. Furthermore, because Patent Owner is advocating a claim construction that "package" should be narrowly interpreted to require a second level interconnect between the package and an external printed circuit board, it is Patent Owner's burden to provide such evidence, rather than the Board's burden to prove a negative (e.g., "the Decision does not identify a single example of package mounting other than surface mounting or through-hole mounting").

Fifth, Patent Owner argues "although the Decision does not actually construe the term, it implicitly attempts to apply an interpretation of 'package' that it views as encompassing Halteren's 'flexible substrate transducer assembly'" and "Halteren's failure to provide a way to

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

mechanically attach the device to a circuit board further results in a corresponding failure to provide protection from mechanical and environmental stresses that is necessary for packages." (Req. for Reh'g 6.)

Our Decision states the following:

> In particular, one relevant definition of "package" which refers to a "second level interconnect" is as follows:

>> We can think of the package as a structure consisting of a semiconductor device, a first-level interconnect system, a wiring structure, a second-level interconnection platform, and an enclosure that protects the system and provides the mechanical platform for the sublevel.

(Dec. 7 (citing Ken Gilleo, ELECTRONIC PACKAGE & INTERCONNECTION HANDBOOK 1.22 (Charles A. Harper ed., McGraw-Hill 3rd ed. 2000).)) Accordingly, based upon this definition, we construed the claim term "package" as broad enough to encompass the transducer assembly 10 of Haltern. (Dec. 10.)

Sixth, Patent Owner argues "the Board overlooks a pertinent Federal Circuit decision [*MEMS Technology Berhad v. Int'l Trade Comm'n*, 447 Fed. Appx. 142, 157–59 (Fed. Cir. 2011)] about the meaning of the term 'package' in related patent claims" (Req. for Reh'g 6) and "the Federal Circuit affirmed the International Trade Commission's determination that Mr. Minervini's 'package' must 'be capable of two levels of electrical connection—one from the device to the package, and one from the package to an external circuit or other system'" (*id.* at 7).

However, this Federal Circuit decision is not germane to the current appeal because the court did not adopted a claim construction that requires "a second level interconnect between the package and an external printed

6

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

circuit board." In fact, our Decision adopts a claim construction nearly identical to the construction adopted by the Federal Circuit in *MEMS Technology Berhad*. (Dec. 7 (citing Ken Gilleo, ELECTRONIC PACKAGE & INTERCONNECTION HANDBOOK 1.22 (Charles A. Harper ed., McGraw-Hill 3rd ed. 2000)).))

Last, Patent Owner argues "[t]he Federal Circuit also held that the essence of Mr. Minervini's invention was 'the containment of the components in a "package,"' and therefore held that the 'components listed in the claim body come together to form a *mountable package*, — distinguishing asserted art [Baumhauer] on that basis." (Req. for Reh'g 7 (citations omitted).)

However, the Federal Circuit held that "Baumhauer discloses a device, not a package" because Baumhauer lacks protection from the environment, rather than adopting a claim construction of "package" requiring a second level interconnect between the package and an external printed circuit board. *MEMS Technology Berhad*, 447 Fed. Appx. at 157–58 ("As the Commission found, Baumhauer Figure 6 discloses a microphone attached directly to a circuit board, not a unit with components that come together to form a mountable package."). Furthermore, our Decision did not reach the rejection of claims 1, 9, 11, 12, 15, 16, and 19 under 35 U.S.C. § 102(b) as anticipated by Baumhauer. (Dec. 16.)

## *Combination of Une and Halteren*

First, Patent Owner argues that "[t]he Decision does not defend the Examiner's cursory obviousness assertion" but "[i]nstead, the Decision on

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

Appeal articulates a new rationale for obviousness based on the Board's new finding that the microphones of Une and Halteren 'apply similar modes of operation by converting measured vibration into electrical signals.'" (Req. for Reh'g 9.)

However, it is not a new ground of rejection for the Board to respond to Patent Owner's arguments using different language, or restating the reasoning of the rejection in a different way, so long as the evidence relied upon is the same and the "basic thrust of the rejection" is the same. *See In re Kronig*, 539 F.2d 1300, 1303 (CCPA 1976). In particular, citing to a different portion of an applied reference, which "goes no farther than, and merely elaborates upon, what is taught by" the previously-cited portion of that reference relied upon by the Examiner, does not constitute a new ground of rejection. *See In re DBC*, 545 F.3d 1373, 1382 n.5 (Fed. Cir. 2008).

In the Right of Appeal Notice, which incorporates the original Request for *Inter Partes* Reexamination by reference, the Examiner states:

> Regarding claim 21, Une (*e.g.* figs. 5 and 8) teaches a method of manufacturing a microphone package comprising: . . . attaching a plurality *condenser microphone units 4/8* to the plurality of package substrates . . . .

(RAN 34 (second emphasis added).)

> Une does not disclose that the condenser microphone is a silicon condenser microphone. However, Halteren (fig. 2A) shows a package including a silicon condenser microphone 61 (col. 5/ll. 10-13). It would have been obvious to one of ordinary skills in the art at the time of the invention was made to use the *silicon condenser microphone of Halteren* in Une's invention because the substitution of one known element for another would have yield predictable results.

(RAN 34–35 (emphasis added).)

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

Furthermore, the original Request for *Inter Partes* Reexamination states:

> Fig. 8 further shows a package with *a single condenser microphone.* Accordingly, Une teaches attaching a single microphone to each of the substrates in the panel shown in Fig. 5. Une, however, does not expressly teach that each microphone is in the form of a silicon die.

> Halteren teaches a condenser microphone in the form of a silicon die. Specifically, Halteren column 5, lines 37-39 describe the condenser microphone by stating that it requires a flexible membrane and a back plate—requirements for any *condenser* (i.e., capacitive) microphone.

(P. 33 (first emphases added).)

Accordingly, Patent Owner's arguments are inaccurate because both the Right of Appeal Notice and the Request for *Inter Partes* Reexamination presented evidence that both the microphone of Une and the condenser microphone of Halteren are capacitive microphones. In other words, as stated in our Decision, "because silicon microphone 61 of Halteren sends output signals to ASIC 62 and solid state device 8 of Une converts capacitance measured from electret capacitor microphone, both Halteren and Une apply similar modes of operation by converting measured vibration into electrical signals." (Dec. 13.)

Second, Patent Owner argues "[t]he Board's new finding further overlooks that electret microphones rely on a charged backplate whereas MEMS microphones rely on biasing voltage and therefore require additional circuitry within the package—i.e., a *different* mode of operation." (Req. for Reh'g 9–10.)

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

However, Patent Owner improperly presents new arguments not raised in the Briefs before the Board. "Arguments not raised, and Evidence not previously relied upon, pursuant to §§41.37, 41.41, or 41.47 are not permitted in the request for rehearing except as permitted by paragraphs (a)(2) through (a)(4) of this section." 37 C.F.R. § 41.52(a)(1). Patent Owner has not identified a reason for meeting one of these exceptions. Furthermore, other than providing a conclusory statement, Patent Owner has not presented any evidence to support the argument that such combination would not have predictable results. Arguments of counsel cannot take the place of factually supported objective evidence. *See, e.g., In re Huang*, 100 F.3d 135, 139–40 (Fed. Cir. 1996).

Third, Patent Owner argues that "the Board overlooked the objective evidence of unique difficulties associated with MEMS packages and especially packages for fragile MEMS microphones" (Req. for Reh'g 10) and "[t]he Decision overlooks all of this objective evidence, and therefore fails to establish that a person skilled in the art would expect predictable results from substituting the fragile MEMS silicon microphone die of Halteren for the non-MEMS microphone components of Une (*id.* at 11). Similarly, Patent Owner argues that "Halteren's MEMS microphone would have predictable results [sic] because it overlooks the numerous additional variables identified by the extrinsic evidence as key to the performance of MEMS microphone packages, including geometric properties, heat dissipation, interference reduction, and thermal expandability." (*Id.* at 9.)

However, as discussed on our Decision (Dec. 13), such evidence submitted by Patent Owner was used to support an argument of bodily

10

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

incorporation and accordingly, is insufficient to rebut the Examiner's prima
facie case of obviousness. *See In re Keller*, 642 F.2d 413, 425 (CCPA 1981)
("The test for obviousness is not whether the features of a secondary
reference may be bodily incorporated into the structure of the primary
reference. . . . Rather, the test is what the combined teachings of the
references would have suggested to those of ordinary skill in the art.").

Fourth, Patent Owner argues "[t]he Decision also errs in discounting
the testimony from Dr. Peter Loeppert that a MEMS transducer substituted
into the Une apparatus would be unlikely to function properly" and "[t]he
Board overlooks that Dr. Loeppert's sworn statements are the only evidence
of record from an expert with experience in microphone design,
manufacturing, and operation, and are corroborated by several disclosures
Loeppert cites that were contemporaneous with the time of the invention as
to why a MEMS die would be inoperable in Une," pointing to paragraphs 2–
5 of the Loeppert Declaration. (Req. for Reh'g 11 (citations omitted).)

However, as discussed in our Decision (Dec. 14), Dr. Loeppert's
testimony, particularly paragraph 6, was based upon the erroneous legal
principle that Figure 8 of Une is drawn to scale, when Une is silent with
respect to scale. *See Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222
F.3d 951, 956 (Fed. Cir. 2000) ("[I]t is well established that patent drawings
do not define the precise proportions of the elements and may not be relied
on to show particular sizes if the specification is completely silent on the
issue.").

Last, Patent Owner argues that "the Board offers no record evidence
or reasoning that substituting a MEMS microphone die for a

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2

multicomponent condenser microphone would be feasible, its obviousness
finding is erroneous" with a citation to *Ex Parte Kang*, Appeal No. 2011-
004083 (PTAB Aug. 1, 2013) (non-precedential).  (Req. for Reh'g 11.)

 Contrary to Patent Owner's arguments, our Decision has provided an
articulated reasoning with some rational underpinning by stating that
"because silicon microphone 61 of Halteren sends output signals to ASIC 62
and solid state device 8 of Une converts capacitance measured from electret
capacitor microphone, both Halteren and Une apply similar modes of
operation by converting measured vibration into electrical signals."
(Dec. 13.)  Furthermore, *Kang* has not been designated as precedential, and
therefore is not binding on this panel.


## CONCLUSION

The Request for Rehearing has been considered and *denied*.


## REHEARING DENIED

Appeal 2015-004989
Reexamination Control 95/001,850
Patent 8,018,049 B2


PATENT OWNER:

LATHROP & GAGE LLP
2345 Grand Boulevard
Suite 2400
Kansas City, MO  64108

THIRD PARTY REQUESTER:

SUNSTEIN KANN MURPHY & TIMBERS LLP
125 Summer Street
Boston, MA  02110-1618



US008018049B2

(12) **United States Patent**

Minervini

(10) **Patent No.:** **US 8,018,049 B2**

(45) **Date of Patent:** *Sep. 13, 2011

(54) **SILICON CONDENSER MICROPHONE AND MANUFACTURING METHOD**

(75) Inventor: **Anthony D. Minervini**, Palos Hills, IL (US)

(73) Assignee: **Knowles Electronics LLC**, Itasca, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1136 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/741,881**

(22) Filed: **Apr. 30, 2007**

(65) **Prior Publication Data**

US 2007/0201715 A1     Aug. 30, 2007

**Related U.S. Application Data**

(60) Division of application No. 10/921,747, filed on Aug. 19, 2004, now Pat. No. 7,434,305, which is a continuation-in-part of application No. 09/886,854, filed on Jun. 21, 2001, now Pat. No. 7,166,910.

(60) Provisional application No. 60/253,543, filed on Nov. 28, 2000.

(51) **Int. Cl.**
  *H01L 23/12* (2006.01)
  *H01L 21/00* (2006.01)
  *H04R 9/08* (2006.01)

(52) **U.S. Cl.** ........ 257/704; 257/724; 257/729; 257/730; 381/369; 438/26; 438/121

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,735,211 | A | 5/1973 | Kapnias |
| 4,127,840 | A | 11/1978 | House |
| 4,222,277 | A | 9/1980 | Kurtz et al. |
| 4,277,814 | A | 7/1981 | Giachinu et al. |
| 4,314,226 | A | 2/1982 | Oguro et al. |
| 4,456,796 | A | 6/1984 | Nakagawa et al. |
| 4,533,795 | A | 8/1985 | Baumhaer, Jr. et al. |
| 4,558,184 | A | 12/1985 | Bush-Vishnrac et al. |
| 4,628,740 | A | 12/1986 | Ueda et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| CA | 2315417 A1 | 2/2001 |
|---|---|---|

(Continued)

OTHER PUBLICATIONS

Scheeper, P.R. et al., "A Review of Silicon Microphones", Sensor and Actuators Actuators. A 44 (1994) pp. 1-11.

(Continued)

*Primary Examiner* — Alonzo Chambliss

(74) *Attorney, Agent, or Firm* — Dykema Gossett PLLC

(57) **ABSTRACT**

A silicon condenser microphone package and method for manufacture are disclosed. The silicon condenser microphone package includes a silicon condenser microphone die, a substrate comprising a conductive layer, and a cover having a conductive layer, where the conductive layers of the substrate and cover are electrically connected to form an electromagnetic interference shield for the silicon condenser microphone die. The method for manufacturing the silicon condenser microphone package involves placement of a plurality of silicon condenser microphone dies on a panel of printed circuit board material, placement of covers over each of the silicon condenser microphone dies, and then separating the panel into individual packages.

**26 Claims, 19 Drawing Sheets**



US 8,018,049 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,691,363 A | 9/1987 | Khanna | |
| 4,737,742 A | 4/1988 | Takoshima et al. | |
| 4,776,019 A | 10/1988 | Miyatake | |
| 4,825,335 A | 4/1989 | Wilner | |
| 4,908,805 A | 3/1990 | Sprenkels et al. | |
| 4,910,840 A | 3/1990 | Sprenkels et al. | |
| 4,984,268 A | 1/1991 | Brown et al. | |
| 5,101,543 A | 4/1992 | Cote et al. | |
| 5,101,665 A | 4/1992 | Mizuno et al. | |
| 5,146,435 A | 9/1992 | Bernstein | |
| 5,151,763 A | 9/1992 | Marek et al. | |
| 5,153,379 A | 10/1992 | Guzuk et al. | |
| 5,178,015 A | 1/1993 | Loeppert et al. | |
| 5,257,547 A | 11/1993 | Boyer | |
| 5,357,807 A | 10/1994 | Guckel et al. | |
| 5,394,011 A | 2/1995 | Yamamoto et al. | |
| 5,408,731 A | 4/1995 | Bergqvist et al. | |
| 5,449,909 A | 9/1995 | Kaiser et al. | |
| 5,452,268 A | 9/1995 | Bernstein | |
| 5,477,008 A | 12/1995 | Pasqualoni et al | |
| 5,490,220 A | 2/1996 | Loeppert | |
| 5,506,919 A | 4/1996 | Roberts | |
| 5,531,787 A | 7/1996 | Lesinski et al. | |
| 5,545,912 A | 8/1996 | Ristic et al. | |
| 5,592,391 A | 1/1997 | Muyshondt et al. | |
| 5,593,926 A | 1/1997 | Fujihira | |
| 5,659,195 A | 8/1997 | Kaiser et al. | |
| 5,712,523 A | 1/1998 | Nakashima et al. | |
| 5,740,261 A | 4/1998 | Loeppert et al. | |
| 5,748,758 A | 5/1998 | Menasco, Jr. et al. | |
| 5,761,053 A | 6/1998 | King et al. | |
| 5,831,262 A | 11/1998 | Greywall et al. | |
| 5,838,551 A | 11/1998 | Chan | |
| 5,852,320 A | 12/1998 | Ichihashi et al. | |
| 5,870,482 A | 2/1999 | Loeppert et al. | |
| 5,886,876 A | 3/1999 | Yamaguchi | |
| 5,889,872 A | 3/1999 | Sooriakumar et al. | |
| 5,901,046 A | 5/1999 | Ohta et al. | |
| 5,923,995 A | 7/1999 | Kao et al. | |
| 5,939,968 A | 8/1999 | Nguyen et al. | |
| 5,999,821 A | 12/1999 | Kaschke | |
| 6,012,335 A | 1/2000 | Bashir et al. | |
| 6,052,464 A | 4/2000 | Harris et al. | |
| 6,078,245 A | 6/2000 | Fritz et al. | |
| 6,108,184 A | 8/2000 | Minervini et al. | |
| 6,118,881 A | 9/2000 | Quinlan et al. | |
| 6,136,419 A | 10/2000 | Fasano et al. | |
| 6,157,546 A | 12/2000 | Petty et al. | |
| 6,163,071 A | 12/2000 | Yamamura | |
| 6,178,249 B1 | 1/2001 | Heitanen et al. | |
| 6,191,928 B1 | 2/2001 | Rector et al. | |
| 6,282,072 B1 | 8/2001 | Minervini et al. | |
| 6,308,398 B1 | 10/2001 | Beavers | |
| 6,324,907 B1 | 12/2001 | Halteren et al. | |
| 6,439,869 B1 | 8/2002 | Seng et al. | |
| 6,522,762 B1 * | 2/2003 | Mullenborn et al. | 381/174 |
| 6,594,369 B1 | 7/2003 | Une | |
| 6,621,392 B1 | 9/2003 | Volant et al. | |
| 6,675,471 B1 | 1/2004 | Kimura et al. | |
| 6,781,231 B2 | 8/2004 | Minervini | |
| 7,003,127 B1 | 2/2006 | Sjursen et al. | |
| 7,080,442 B2 | 7/2006 | Kawamura et al. | |
| 7,092,539 B2 | 8/2006 | Sheplak et al. | |
| 7,166,910 B2 * | 1/2007 | Minervini | 257/704 |
| 7,242,089 B2 * | 7/2007 | Minervini | 257/704 |
| 7,381,589 B2 * | 6/2008 | Minervini | 438/113 |
| 7,434,305 B2 * | 10/2008 | Minervini | 29/594 |
| 7,439,616 B2 * | 10/2008 | Minervini | 257/704 |
| 7,537,964 B2 * | 5/2009 | Minervini | 438/113 |
| 2002/0067663 A1 | 6/2002 | Loeppert et al. | |
| 2002/0102004 A1 | 8/2002 | Minervini | |
| 2003/0052404 A1 | 3/2003 | Thomas | |
| 2003/0133588 A1 | 7/2003 | Pedersen | |
| 2004/0032705 A1 | 2/2004 | Ma | |
| 2004/0184632 A1 | 9/2004 | Minervini | |
| 2005/0018864 A1 | 1/2005 | Minervini | |
| 2005/0069164 A1 | 3/2005 | Muthuswamy et al. | |
| 2005/0185812 A1 | 8/2005 | Minervini | |
| 2006/0157841 A1 | 7/2006 | Minervini | |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 077 615 A1 | 4/1983 |
| EP | 0 774 888 A2 | 5/1997 |
| FI | 981413 | 12/1999 |
| JP | 07-099420 | 4/1995 |
| JP | 09-107192 | 4/1997 |
| JP | 09-318650 | 12/1997 |
| JP | 2000-165999 | 6/2000 |
| JP | 2000-277970 | 10/2000 |
| WO | WO 00/42636 A2 | 7/2000 |
| WO | 2000-316042 | 11/2000 |
| WO | WO-01/19133 A1 | 3/2001 |
| WO | WO 01/20948 A2 | 3/2001 |
| WO | WO 01/41497 A1 | 6/2001 |
| WO | WO-02/45463 A2 | 6/2002 |
| WO | WO-2006/020478 | 2/2006 |
| WO | WO-2006/061058 | 6/2006 |

## OTHER PUBLICATIONS

Rosenberger, M.E., "Absolute Pressure Transducer for Turbo Application", 820320, pp. 77-79.

Notice of Investigation, Inv. No. 337-TA-629, in the Matter of "Certain Silicon Microphone Packages and Products Containing the Same", United States International Trade Commission, issued Jan. 3, 2008.

Arnold, David P. et al., "MEMS-Based Acoustic Array Technology," 40th AIAA Aerospace Sciences Meeting & Exhibit, Jan. 14-17, 2000, American Institute of Aeronautics and Astronautics, Reston, Virginia.

Arnold, David Patrick, "A MEMS-Based Directional Acoustic Array for Aeroacoustic Measurements," Master's Thesis, University of Florida (2001.).

Bever, T. et al., "BICMOS Compatible Silicon Microphone Packaged as Surface Mount Device," Sensors Expo (1999).

Premachandran, C.S. et al., "Si-based Microphone Testing Methodology and Noise Reduction," p. 588, Proceedings of SPIE, vol. 4019 (2000).

Petersen, Kurt et al., "Silicon Accelerometer Family; Manufactured for Automotive Applications" (1992).

"Pressure Transducer Handbook," pp. 4-2 to 4-5, 12-1 to 12-5, National Semiconductor Corp., USA (1977).

Giasolli, Robert, "MEMS Packaging Introduction," (Nov. 2000).

Henning, Albert K. et al., "Microfluidic MFMS for Semiconductor Processing," IEEE Transactions on Components, Packaging, & Mfg. Tech., Part B, pp. 329-337, vol. 21, No. 4 (Nov. 1998).

Gale, Bruce K., "MEMS Packaging," Microsystems Principles (Oct. 2001).

Torkkeli, Altti et al. "Capacitive Silicon Microphone," Physica Scripta, vol. T79, pp. 275-278 (1999).

Torkkeli, Altti et al., "Capacitive microphone with low-stress polysilicon membrane and high-stress polysilicon backplate," Sensors and Actuators, vol. 85., pp. 116-123 (2000).

"Ball Grid Array Technology," Lau, John editor, McGraw Hill, Inc. (1995).

"Electronic Packaging and Interconnection Handbook," Harper, Charles editor, Ch. 7, McGraw-Hill (2000).

Kress, H.J. et al., "Integrated Silicon Pressure Sensor for Automotive Application with Electronic Trimming," SAE International, International Congress and Exposition, Detroit, Michigan (Feb. 27, 1995-Mar. 2, 1995).

Wiley Electrical and Electronics Engineering Dictionary, p. 275, IEEE Press (2004).

Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond, In the Matter of Certain Silicon Microphone Packages and Products Containing the Same, ITC Inv. No. 337-TA-695 (Nov. 22, 2010).

Notice of Commission Determination to Review in Part an Initial Determination, In the Matter of Certain Silicon Microphone Packages and Products Containing the Same, ITC Inv. No. 337-TA-695 (Jan. 21, 2011).

Initial Determination on Violation of Section 337 and Recommended Determination on Remedy and Bond, In the Matter of Certain Silicon Microphone Packages and Products Containing the Same, ITC Inv. No. 337-TA-629 (Jan. 12, 2009).

Commission Opinion, In the Matter of Certain Silicon Microphone Packages and Products Containing the Same, ITC Inv. No. 337-TA-629 (Aug. 18, 2009).

Federal Circuit Court of Appeals Opinion, *Mems Technology Berhad v International Trade Commission and Knowles Electronics LLC*, Case No. 2010-1018 (Jun. 3, 2011).

* cited by examiner



**FIGURE 1**



**FIGURE 2**



**FIGURE 3**



**FIGURE 4**



**FIGURE 5**



**FIGURE 6**



**FIGURE 7**



**FIGURE 8**



**FIGURE 9**



**FIGURE 10**



**FIGURE 11**



**FIGURE 12**



**FIGURE 13**



**FIGURE 14A**



## FIGURE 14B



## FIGURE 14C



**FIGURE 14D**



**FIGURE 15**



**FIGURE 16**



**FIGURE 17**



**FIGURE 18**



**FIGURE 19**



**FIGURE 20**



**FIGURE 21**



**FIGURE 22**



**FIGURE 23**



**FIGURE 24**



**FIGURE 25**



**FIGURE 26**



**FIGURE 27**



**FIGURE 28**



**FIGURE 29**



**FIGURE 30**



# FIGURE 31

US 8,018,049 B2

1

# SILICON CONDENSER MICROPHONE AND MANUFACTURING METHOD

## RELATED APPLICATION

This application is a divisional of U.S. application Ser. No. 10/921,747 filed Aug. 18, 2004, now U.S. Pat. No. 7,434,305, which is a continuation-in-part of U.S. application Ser. No. 09/886,854, filed Jun. 21, 2001, now U.S. Pat. No. 7,166,910, which claims the benefit of provisional patent application Ser. No. 60/253,543 filed Nov. 28, 2000. These applications are hereby incorporated by reference herein in their entireties for all purposes.

## TECHNICAL FIELD

This patent relates generally to a housing for a transducer. More particularly, this patent relates to a silicon condenser microphone including a housing for shielding a transducer.

## BACKGROUND OF THE INVENTION

There have been a number of disclosures related to building microphone elements on the surface of a silicon die. Certain of these disclosures have come in connection with the hearing aid field for the purpose of reducing the size of the hearing aid unit. While these disclosures have reduced the size of the hearing aid, they have not disclosed how to protect the transducer from outside interferences. For instance, transducers of this type are fragile and susceptible to physical damage. Furthermore, they must be protected from light and electromagnetic interferences. Moreover, they require an acoustic pressure reference to function properly. For these reasons, the silicon die must be shielded.

Some shielding practices have been used to house these devices. For instance, insulated metal cans or discs have been provided. Additionally, DIPs and small outline integrated circuit (SOIC) packages have been utilized. However, the drawbacks associated with manufacturing these housings, such as lead time, cost, and tooling, make these options undesirable.

## SUMMARY OF THE INVENTION

The present invention is directed to a silicon condenser microphone package that allows acoustic energy to contact a transducer disposed within a housing. The housing provides the necessary pressure reference while at the same time protects the transducer from light, electromagnetic interference, and physical damage. In accordance with an embodiment of the invention a silicon condenser microphone includes a transducer and a substrate and a cover forming the housing. The substrate may have an upper surface with a recess formed therein allowing the transducer to be attached to the upper surface and to overlap at least a portion of the recess thus forming a back volume. The cover is placed over the transducer and includes an aperture adapted for allowing sound waves to reach the transducer.

Other features and advantages of the invention will be apparent from the following specification taken in conjunction with the following drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a cross-sectional view of a first embodiment of a silicon condenser microphone of the present invention;

2

FIG. 2 is a cross-sectional view of a second embodiment of a silicon condenser microphone of the present invention;

FIG. 3 is a cross-sectional view of a third embodiment of a silicon condenser microphone of the present invention;

FIG. 4 is a cross-sectional view of the third embodiment of the present invention affixed to an end user circuit board;

FIG. 5 is a cross-sectional view of the third embodiment of the present invention affixed to an end user circuit board in an alternate fashion; and

FIG. 6 is a plan view of a substrate to which a silicon condenser microphone is fixed;

FIG. 7 is a longitudinal cross-sectional view of a microphone package of the present invention;

FIG. 8 is a lateral cross-sectional view of a microphone package of the present invention;

FIG. 9 is a longitudinal cross-sectional view of a microphone package of the present invention;

FIG. 10 is a lateral cross-sectional view of a microphone package of the present invention;

FIG. 11 is a cross-sectional view of a top portion for a microphone package of the present invention;

FIG. 12 is a cross-sectional view of a top portion for a microphone package of the present invention;

FIG. 13 is a cross-sectional view of a top portion for a microphone package of the present invention;

FIG. 14a is a cross-sectional view of a laminated bottom portion of a housing for a microphone package of the present invention;

FIG. 14b is a plan view of a layer of the laminated bottom portion of FIG. 14a;

FIG. 14c is a plan view of a layer of the laminated bottom portion of FIG. 14a;

FIG. 14d is a plan view of a layer of the laminated bottom portion of FIG. 14a;

FIG. 15 is a cross-sectional view of a bottom portion for a microphone package of the present invention;

FIG. 16 is a cross-sectional view of a bottom portion for a microphone package of the present invention;

FIG. 17 is a cross-sectional view of a bottom portion for a microphone package of the present invention;

FIG. 18 is a cross-sectional view of a bottom portion for a microphone package of the present invention;

FIG. 19 is a plan view of a side portion for a microphone package of the present invention;

FIG. 20 is a cross-sectional view of a side portion for a microphone package of the present invention;

FIG. 21 is a cross-sectional view of a side portion for a microphone package of the present invention;

FIG. 22 is a cross-sectional view of a side portion for a microphone package of the present invention;

FIG. 23 is a cross-sectional view of a microphone package of the present invention;

FIG. 24 is a cross-sectional view of a microphone package of the present invention;

FIG. 25 is a cross-sectional view of a microphone package of the present invention;

FIG. 26 is a cross-sectional view of a microphone package of the present invention;

FIG. 27 is a cross-sectional view of a microphone package of the present invention with a retaining ring;

FIG. 28 is a cross-sectional view of a microphone package of the present invention with a retaining wing;

FIG. 29 is a cross-sectional view of a microphone package of the present invention with a retaining ring;

FIG. 30 is a plan view of a panel of a plurality of microphone packages; and

FIG. 31 is a plan view of a microphone pair.

US 8,018,049 B2

**3**

DETAILED DESCRIPTION

While the invention is susceptible of embodiments in many different forms, there is shown in the drawings and will herein be described in detail several possible embodiments of the invention with the understanding that the present disclosure is to be considered as an exemplification of the principles of the invention and is not intended to limit the broad aspect of the invention to the embodiments illustrated.

The present invention is directed to microphone packages. The benefits of the microphone packages disclosed herein over microphone packaging utilizing plastic body/lead frames include the ability to process packages in panel form allowing more units to be formed per operation and at much lower cost. The typical lead frame for a similarly functioning package would contain between 40 and 100 devices connected together. The present disclosure would have approximately 14,000 devices connected together (as a panel). Also, the embodiments disclosed herein require minimal "hard-tooling" This allows the process to adjust to custom layout requirements without having to redesign mold, lead frame, and trim/form tooling.

Moreover, many of the described embodiments have a better match of thermal coefficients of expansion with the end user's PCB, typically made of FR-4, since the microphone package is also made primarily of FR-4. These embodiments of the invention may also eliminate the need for wire bonding that is required in plastic body/lead frame packages. The footprint is typically smaller than that would be required for a plastic body/lead frame design since the leads may be formed by plating a through-hole in a circuit board to form the pathway to the solder pad. In a typical plastic body/lead frame design, a gull wing configuration will be used in which the leads widen the overall foot print.

Now, referring to FIGS. 1-3, three embodiments of a silicon condenser microphone package 10 of the present invention are illustrated. Included within silicon microphone package 10 is a transducer 12, e.g. a silicon condenser microphone as disclosed in U.S. Pat. No. 5,870,482 which is hereby incorporated by reference and an amplifier 16. The package itself includes a substrate 14, a back volume or air cavity 18, which provides a pressure reference for the transducer 12, and a cover 20. The substrate 14 may be formed of FR-4 material allowing processing in circuit board panel form, thus taking advantage of economies of scale in manufacturing. FIG. 6 is a plan view of the substrate 14 showing the back volume 18 surrounded by a plurality of terminal pads.

The back volume 18 may be formed by a number of methods, including controlled depth drilling of an upper surface 19 of the substrate 14 to form a recess over which the transducer 12 is mounted (FIG. 1); drilling and routing of several individual sheets of FR-4 and laminating the individual sheets to form the back volume 18, which may or may not have internal support posts (FIG. 2); or drilling completely through the substrate 14 and providing a sealing ring 22 on the bottom of the device that will seal the back volume 18 during surface mounting to a user's "board" 28 (FIGS. 3-5). In this example, the combination of the substrate and the user's board 28 creates the back volume 18. The back volume 18 is covered by the transducer 12 (e.g., a MEMS device) which may be "bumpbonded" and mounted face down. The boundary is sealed such that the back volume 18 is operably "air-tight".

The cover 20 is attached for protection and processability. The cover 20 contains an aperture 24 which may contain a sintered metal insert 26 to prevent water, particles and/or light from entering the package and damaging the internal components inside; i.e. semiconductor chips. The aperture 24 is

**4**

adapted for allowing sound waves to reach the transducer 12. The sintered metal insert 26 will also have certain acoustic properties, e.g. acoustic damping or resistance. The sintered metal insert 26 may therefore be selected such that its acoustic properties enhance the functional capability of the transducer 12 and/or the overall performance of the silicon microphone 10.

Referring to FIGS. 4 and 5 the final form of the product is a silicon condenser microphone package 10 which would most likely be attached to an end user's PCB 28 via a solder reflow process. FIG. 5 illustrates a method of enlarging the back volume 18 by including a chamber 32 within the end user's circuit board 28.

Another embodiment of a silicon condenser microphone package 40 of the present invention is illustrated in FIGS. 7-10. In this embodiment, a housing 42 is formed from layers of materials, such as those used in providing circuit boards. Accordingly, the housing 42 generally comprises alternating layers of conductive and non-conductive materials 44, 46. The non-conductive layers 46 are typically FR-4 board. The conductive layers 44 are typically copper. This multi-layer housing construction advantageously permits the inclusion of circuitry, power and ground planes, solder pads, ground pads, capacitance layers and plated through holes pads within the structure of the housing itself. The conductive layers provide EMI shielding while also allowing configuration as capacitors and/or inductors to filter input/output signals and/or the input power supply.

In the embodiment illustrated, the housing 42 includes a top portion 48 and a bottom portion 50 spaced by a side portion 52. The housing 42 further includes an aperture or acoustic port 54 for receiving an acoustic signal and an inner chamber 56 which is adapted for housing a transducer unit 58, typically a silicon die microphone or a ball grid array package (BGA). The top, bottom, and side portions 48, 50, 52 are electrically connected, for example with a conductive adhesive 60. The conductive adhesive may be provided conveniently in the form of suitably configured sheets of dry adhesive disposed between the top, bottom and side portions 48, 50 and 52. The sheet of dry adhesive may be activated by pressure, heat or other suitable means after the portions are brought together during assembly. Each portion may comprise alternating conductive and non-conductive layers of 44, 46.

The chamber 56 may include an inner lining 61. The inner lining 61 is primarily formed by conductive material. It should be understood that the inner lining may include portions of non-conductive material, as the conductive material may not fully cover the non-conductive material. The inner lining 61 protects the transducer 58 against electromagnetic interference and the like, much like a faraday cage. The inner lining 61 may also be provided by suitable electrically coupling together of the various conductive layers within the top, bottom and side portions 48, 50 and 52 of the housing.

In the various embodiments illustrated in FIGS. 7-10 and 23-26, the portions of the housing 42 that include the aperture or acoustic port 54 further include a layer of material that forms an environmental barrier 62 over or within the aperture 54. This environmental barrier 62 is typically a polymeric material formed to a film, such as a polytetrafluoroethylene (PTFE) or a sintered metal. The environmental barrier 62 is supplied for protecting the chamber 56 of the housing 42, and, consequently, the transducer unit 58 within the housing 42, from environmental elements such as sunlight, moisture, oil, dirt, and/or dust. The environmental barrier 62 will also have inherent acoustic properties, e.g. acoustic damping/resistance. Therefore the environmental barrier 62 is chosen such

5

that its acoustic properties cooperate with the transducer unit **58** to enhance the performance of the microphone. This is particularly true in connection with the embodiments illustrated in FIGS. **24** and **25**, which may be configured to operate as directional microphones.

The environmental barrier layer **62** is generally sealed between layers of the portion, top **48** or bottom **50** in which the acoustic port **54** is formed. For example, the environmental barrier may be secured between layers of conductive material **44** thereby permitting the layers of conductive material **44** to act as a capacitor (with electrodes defined by the metal) that can be used to filter input and output signals or the input power. The environmental barrier layer **62** may further serve as a dielectric protective layer when in contact with the conductive layers **44** in the event that the conductive layers also contain thin film passive devices such as resistors and capacitors.

In addition to protecting the chamber **56** from environmental elements, the barrier layer **62** allows subsequent wet processing, board washing of the external portions of the housing **42**, and electrical connection to ground from the walls via thru hole plating. The environmental barrier layer **62** also allows the order of manufacturing steps in the fabrication of the printed circuit board-based package to be modified. This advantage can be used to accommodate different termination styles. For example, a double sided package can be fabricated having a pair of apertures **54** (see FIG. **25**), both including an environmental barrier layer **62**. The package would look and act the same whether it is mounted face up or face down, or the package could be mounted to provide directional microphone characteristics. Moreover, the environmental barrier layer **62** may also be selected so that its acoustic properties enhance the directional performance of the microphone.

Referring to FIGS. **7**, **8**, and **11-13** the transducer unit **58** is generally not mounted to the top portion **48** of the housing. This definition is independent of the final mounting orientation to an end user's circuit board. It is possible for the top portion **48** to be mounted face down depending on the orientation of the transducer **58** as well as the choice for the bottom material **50**. The conductive layers **44** of the top portion **48** may be patterned to form circuitry, ground planes, solder pads, ground pads, capacitors and plated through hole pads. Referring to FIGS. **1-13** there may be additional alternating conductive layers **44**, non-conductive layers **46**, and environmental protective membranes **62** as the package requires. Alternatively, some layers may be deliberately excluded as well. The first non-conductive layer **46** may be patterned so as to selectively expose certain features on the first conductive layer **44**.

FIG. **11** illustrates an alternative top portion **48** for a microphone package. In this embodiment, a connection between the layers can be formed to provide a conduit to ground. The top portion of FIG. **11** includes ground planes and/or pattern circuitry **64**, and the environmental barrier **62**. The ground planes and or pattern circuitry **64** are connected by pins **65**.

FIG. **12** illustrates another embodiment of a top portion **48**. In addition to the connection between layers, ground planes/ pattern circuitry **64**, and the environmental barrier **62**, this embodiment includes conductive bumps **66** (e.g. Pb/Sn or Ni/Au) patterned on the bottom side to allow secondary electrical contact to the transducer **58**. Here, conductive circuitry would be patterned such that electrical connection between the bumps **66** and a plated through hole termination is made.

FIG. **13** illustrates yet another embodiment of the top portion **48**. In this embodiment, the top portion **48** does not include an aperture or acoustic port **54**.

6

Referring to FIGS. **7**, **8** and **14-18**, the bottom portion **50** is the component of the package to which the transducer **58** is primarily mounted. This definition is independent of the final mounting orientation to the end user's circuit board. It is possible for the bottom portion **50** to be mounted facing upwardly depending on the mounting orientation of the transducer **58** as well as the choice for the top portion **48** construction. Like the top portion **48**, the conductive layers **44** of the bottom portion **50** may be patterned to form circuitry, ground planes, solder pads, ground pads, capacitors and plated through hole pads. As shown in FIGS. **14-18**, there may be additional alternating conductive layers **44**, non-conductive layers **46**, and environmental protective membranes **62** as the package requires. Alternatively, some layers may be deliberately excluded as well. The first non-conductive layer **46** may be patterned so as to selectively expose certain features on the first conductive layer **44**.

Referring to FIGS. **14a** through **14d**, the bottom portion **50** comprises a laminated, multi-layered board including layers of conductive material **44** deposited on layers of non-conductive material **46**. Referring to FIG. **14b**, the first layer of conductive material is used to attach wire bonds or flip chip bonds. This layer includes etched portions to define lead pads, bond pads, and ground pads. The pads would have holes drilled through them to allow the formation of plated through-holes.

As shown in FIG. **14c**, a dry film **68** of non-conductive material covers the conductive material. This illustration shows the exposed bonding pads as well as an exposed ground pad. The exposed ground pad would come in electrical contact with the conductive epoxy and form the connection to ground of the side portion **52** and the base portion **50**.

Referring to FIG. **14d**, ground layers can be embedded within the base portion **50**. The hatched area represents a typical ground plane **64**. The ground planes do not overlap the power or output pads, but will overlap the transducer **58**.

Referring to FIG. **15**, an embodiment of the bottom portion **50** is illustrated. The bottom portion **50** of this embodiment includes a solder mask layer **68** and alternating layers of conductive and non-conductive material **44**, **46**. The bottom portion further comprises solder pads **70** for electrical connection to an end user's board.

FIGS. **16** and **17** illustrate embodiments of the bottom portion **50** with enlarged back volumes **18**. These embodiments illustrate formation of the back volume **18** using the conductive/non-conductive layering.

FIG. **18** shows yet another embodiment of the bottom portion **50**. In this embodiment, the back portion **50** includes the acoustic port **54** and the environmental barrier **62**.

Referring to FIG. **7-10** and **19-22**, the side portion **52** is the component of the package that joins the bottom portion **50** and the top portion **48**. The side portion **52** may include a single layer of a non-conductive material **46** sandwiched between two layers of conductive material **44**. The side portion **52** forms the internal height of the chamber **56** that houses the transducer **58**. The side portion **52** is generally formed by one or more layers of circuit board material, each having a routed window **72** (see FIG. **19**).

Referring to FIGS. **19-22**, the side portion **52** includes inner sidewalls **74**. The inner sidewalls **74** are generally plated with a conductive material, typically copper, as shown in FIGS. **20** and **21**. The sidewalls **74** are formed by the outer perimeter of the routed window **72** and coated/metalized with a conductive material.

Alternatively, the sidewalls **74** may be formed by may alternating layers of non-conductive material **46** and conductive material **44**, each having, a routed window **72** (see FIG.

US 8,018,049 B2

7

19). In this case, the outer perimeter of the window **72** may not require coverage with a conductive material because the layers of conductive material **44** would provide effective shielding.

FIGS. **23-26** illustrate various embodiments of the microphone package **40**. These embodiments utilize top, bottom, and side portions **48**, **50**, and **52** which are described above. It is contemplated that each of the top, bottom, and side portion **48**, **50**, **52** embodiments described above can be utilized in any combination without departing from the invention disclosed and described herein.

In FIG. **23**, connection to an end user's board is made through the bottom portion **50**. The package mounting orientation is bottom portion **50** down Connection from the transducer **58** to the plated through holes is be made by wire bonding. The transducer back volume **18** is formed by the back hole (mounted down) of the silicon microphone only. Bond pads, wire bonds and traces to the terminals are not shown. A person of ordinary skilled in the art of PCB design will understand that the traces reside on the first conductor layer **44**. The wire bonds from the transducer **58** are be connected to exposed pads. The pads are connected to the solder pads via plated through holes and traces on the surface.

In FIG. **24**, connection to the end user's board is also made through the bottom portion **50**. Again, the package mounting orientation is bottom portion **50** Connection from the transducer **58** to the plated through holes are made by wire bonding. The back volume **18** is formed by a combination of the back hole of the transducer **58** (mounted down) and the bottom portion **50**.

In FIG. **25**, connection to the end user's board is also made through the bottom portion **50**. Again, the package mounting orientation is bottom portion **50**. Connection from the transducer **58** to the plated through holes are made by wire bonding. With acoustic ports **54** on both sides of the package, there is no back volume. This method is suitable to a directional microphone.

In FIG. **26**, connection to the end user's board is made through the top portion **48** or the bottom portion **53**. The package mounting orientation is either top portion **48** down or bottom portion **50** down. Connection from the transducer **58** to the plated through holes is made by flip chipping or wire bonding and trace routing. The back volume **18** is formed by using the air cavity created by laminating the bottom portion **50** and the top portion **48** together. Some portion of the package fabrication is performed after the transducer **58** has been attached. In particular, the through hole formation, plating, and solder pad definition would be done after the transducer **58** is attached. The protective membrane **62** is hydrophobic and prevents corrosive plating chemistry from entering the chamber **56**.

Referring to FIGS. **27-29**, the portion to which the transducer unit **58** is mounted may include a retaining ring **84**. The retaining ring **84** prevents wicking of an epoxy **86** into the transducer **58** and from flowing into the acoustic port or aperture **54**. Accordingly, the shape of the retaining ring **84** will typically match the shape of the transducer **58** foot print. The retaining ring **84** comprises a conductive material (e.g., 3 mil. thick copper) imaged on a non-conductive layer material.

Referring to FIG. **27**, the retaining ring **84** is imaged onto a nonconductive layer. An epoxy is applied outside the perimeter of the retaining ring **84**, and the transducer **58** is added so that it overlaps the epoxy **86** and the retaining ring **84**. This reduces epoxy **86** wicking up the sides of the transducer's **58** etched port (in the case of a silicon die microphone).

Alternatively, referring to FIG. **28**, the retaining ring **84** can be located so that the transducer **58** does not contact the

8

retaining ring **84**. In this embodiment, the retaining ring **84** is slightly smaller than the foot print of the transducer **58** so that the epoxy **86** has a restricted path and is, thus, less likely to wick. In FIG. **29**, the retaining ring **84** is fabricated so that it contacts the etched port of the transducer **58**. The following tables provide an illustrative example of a typical circuit board processing technique for fabrication of the housing of this embodiment.

TABLE 1

| | Materials | | |
|---|---|---|---|
| Material Type | | Component | Note |
| 1 | 0.5/0.5 oz. DST Cu 5 core FR-4 | Bottom Portion (Conductive Layers Non-Conductive Layer 1 | |
| 2 | 0.5/0.5 oz. DST Cu 5 core FR-4 | Bottom Portion (Conductive Layers 3 and 4; Non Conductive Layer 2) | |
| 3 | 106 pre-preg | | For Laminating Material 1 and Material 2 |
| 4 | 0.5/0.5 oz. DST Cu 40 Core FR-4 | Side Portion | Metallized Afterward |
| 5 | Bare/0.5 oz Cu 2 core FR-4 (2 pieces) | Top Portion (Each Piece Includes 1 Conductive and 1 Non-Conductive Layers) | |
| 6 | Expanded PTTE | Environmental Barrier | |

TABLE 2

| | Processing of Materials (Base Portion Material 1) | | |
|---|---|---|---|
| Step | Type | Description | Note |
| 1 | Dry Film Conductive Layers | | |
| 2 | Expose | Mask Material 1 (Upper Conductive Layer) | Forms Ground Plane on Lower Conductive Layer |
| 3 | Develop | | |
| 4 | Etch Cu | | No Etching on Upper Conductive Layer |
| 5 | Strip Dry Film | | |

TABLE 3

| | Processing of Materials (Bottom Portion Material 2) | | |
|---|---|---|---|
| Step | Type | Description | Note |
| 1 | Dry Film Conductive Layers | | |
| 2 | Expose | Mask Material 2 (Upper Conductive Layer) | Forms Ground Plane on Upper Conductive Layer |
| 3 | Develop | | |
| 4 | Etch Cu | | No Etching on Lower Conductive Layer |
| 5 | Strip Dry Film | | |

US 8,018,049 B2

**9**

**10**

TABLE 4

Processing of Materials 1, 2, and 3 (Form Bottom Portion)

| Step | Type | Description | Note |
|------|------|-------------|------|
| 1 | Laminate | Materials 1 and 2 Laminated Using Material 3 | |
| 2 | Drill Thru Holes | Drill Bit = 0.025 in. | |
| 3 | Direct Metallization/ Flash Copper | Plates Thru Holes | |
| 4 | Dry Film (L1 and L4) | | |
| | Expose | Mask Laminated Materials 1 and 2 (Upper and Lower Conductive Layers) | Forms Traces and Solder Pads |
| 6 | Develop | | |
| 7 | Electrolytic Cu | 1.0 mil | |
| 8 | Electrolytic Sn | As Required | |
| 9 | Strip Dry Film | | |
| 10 | Etch Cu | | |
| 11 | Etch Cu | | |
| 12 | Insert Finishing Option Here | NG Option (See Table Below) | NG Option for Proof of Principle |
| 13 | Dry Film (cover lay) on Upper Conductive Layer Only | 2.5 mil | Minimum Thickness on Upper Conductive Layer |
| 14 | Expose | Mask Laminated Materials 1 and 2 (upper and lower) | This mask defines an area on the upper conductive layer that will receive a dry film solder mask (cover lay). The bottom layer will not have dry film applied to it. The plated through holes will be bridged over by the coating on the top. |
| 15 | Develop | | |
| 16 | Cure | Full Cure | |
| 17 | Route Panels | Route Bit = As Required | Forms 4" × 4" pieces. Conforms to finished dims |

Table 5 describes the formation of the side portion **52**. This process involves routing a matrix of openings in FR-4 board. However, punching is thought to be the cost effective method for manufacturing. The punching may done by punching through the entire core, or, alternatively, punching several layers of no-flow pre-preg and thin core c-stage which are then laminated to form the wall of proper thickness.

After routing the matrix, the board will have to be electroless or DM plated. Finally, the boards will have to be routed to match the bottom portion. This step can be done first or last. It may make the piece more workable to perform the final routing as a first step.

TABLE 5

Processing of Material 4 (Side Portion)

| Step | Type | Description | Note |
|------|------|-------------|------|
| 1 | Route/Punch Matric of Openings | Route Bit = 0.031 in. | Forms Side Portion |

TABLE 5-continued

Processing of Material 4 (Side Portion)

| Step | Type | Description | Note |
|------|------|-------------|------|
| 2 | Direct Metallization/ Flash Cu | 0.25 mil minimum | Forms Sidewalls on Side Portion |
| 3 | Route Panels | | |

Table 6 describes the processing of the top portion. The formation of the top portion **48** involves imaging a dry film cover lay or liquid solder mask on the bottom (i.e. conductive layer forming the inner layer. The exposed layer of the top portion **48** will not have a copper coating. It can be processed this way through etching or purchased this way as a one sided laminate.

A matrix of holes is drilled into the lid board. Drilling may occur after the imaging step. If so, then a suitable solder mask must be chosen that can survive the drilling process.

TABLE 6

Processing of Top Portion

| Step | Type | Description | Note |
|------|------|-------------|------|
| 1 | Dry Film | Conductive Layer | |
| 2 | Expose | Mask Bare Layer | Form Conduction Ring |
| 3 | Develop | | |
| 4 | Cure | | |
| 5 | Drill Matrix of holes | Drill Bit 0.025 in. | Acoustic Ports |
| 6 | Laminate | PTFE (Environmental Barrier) Between 2 Pieces of Material 5 | Forms Top Portion |

TABLE 7

Processing of Laminated Materials 1 and 2 with Material 4

| Step | Type | Description | Note |
|------|------|-------------|------|
| 1 | Screen Conductive Adhesive on Material 4 | | |
| 2 | Laminate | Bottom Portion with Side Portion | Forms Bottom Portion with Side Portion (spacer) |
| 3 | Add Transducer Assembly | Silicon Die Microphone and Integrated Ciruit | |

TABLE 8

Processing of Laminated Materials 1, 2, and 4 with Material 5

| Step | Type | Description | Note |
|------|------|-------------|------|
| 1 | Screen Conductive Adhesive on Top Portion | | |
| 2 | Laminate | Bottom Portion and Side Portion with Top Portion | Forms Housing |
| 3 | Dice | | |

US 8,018,049 B2

| 11 | 12 |

## TABLE 9

| | Finishing Option NG (Nickel/Gold) | | |
|---|---|---|---|
| Step | Type | Description | Note |
| 1 | Immersion Ni (40-50 µ-in) | | |
| 2 | Immersion Au (25-30 µ-in) | | |

## TABLE 10

| | Finishing Option NGT (Nickel/Gold/Tin) |
|---|---|
| Step | Type |
| 1 | Mask L2 (using thick dry film or high tack dicing tape) |
| 2 | Immersion Ni (40-50 µ-in) |
| 3 | Immersion Au (25-30 µ-in) |
| 4 | Remove Mask on L2 |
| 5 | Mask L1 (using thick dry film or high tack dicing tape) bridge over cavity created by wall |
| 6 | Immersion Sn (100-250 µ-in) |
| 7 | Remove Mask on L1 |

## TABLE 11

| | Finishing Option ST (Silver/Tin) |
|---|---|
| Step | Type |
| 1 | Mask L2 (using thick dry film or high tack dicing tape) |
| 2 | Immersion Ag (40-50 µ-in) |
| 3 | Remove Mask on L2 |
| 4 | Mask L1 (using thick dry film or high tack dicing tape) bridge over cavity created by wall |
| 5 | Immersion Sn (100-250 µ-in) |
| 6 | Remove Mask on L1 |

FIG. **30** is a plan view illustrating a panel **90** for forming a plurality of microphone packages **92**. The microphone packages **92** are distributed on the panel **90** in a 14×24 array, or 336 microphone packages total. Fewer or more microphone packages may be disposed on the panel **90**, or on smaller or larger panels. As described herein in connection with the various embodiments of the invention, the microphone packages include a number of layers, such as top, bottom and side portions of the housing, environmental barriers, adhesive layers for joining the portions, and the like. To assure alignment of the portions as they are brought together, each portion may be formed to include a plurality of alignment apertures **94**. To simultaneously manufacture several hundred or even several thousand microphones, a bottom layer, such as described herein, is provided. A transducer, amplifier and components are secured at appropriate locations on the bottom layer corresponding to each of the microphones to be manufactured. An adhesive layer, such as a sheet of dry adhesive is positioned over the bottom layer, and a sidewall portion layer is positioned over the adhesive layer. An additional dry adhesive layer is positioned, followed by an environmental barrier layer, another dry adhesive layer and the top layer. The dry adhesive layers are activated, such as by the application of heat and/or pressure. The panel is then separated into individual microphone assemblies using known panel cutting and separating techniques.

The microphone, microphone package and method of assembly herein described further allow the manufacture of multiple microphone assembly, such as microphone pairs. In the simplest form, during separation two microphones may be

left joined together, such as the microphone pair **96** shown in FIG. **31**. Each microphone **98** and **100** of the microphone pair **96** is thus a separate, individually operable microphone in a single package sharing a common sidewall **102**. Alternatively, as described herein, conductive traces may be formed in the various layers of either the top or bottom portion thus allowing multiple microphones to be electrically coupled.

While specific embodiments have been illustrated and described, numerous modifications come to mind without significantly departing from the spirit of the invention, and the scope of protection is only limited by the scope of the accompanying Claims.

I claim:

**1**. A silicon condenser microphone package comprising:

a package housing formed by connecting a multi-layer substrate comprising at least one layer of conductive material and at least one layer of non-conductive material, to a cover comprising at least one layer of conductive material;

a cavity formed within the interior of the package housing;

an acoustic port formed in the package housing; and

a silicon condenser microphone die disposed within the cavity in communication with the acoustic port;

where the at least one layer of conductive material in the substrate is electrically connected to the at least one layer of conductive material in the cover to form a shield to protect the silicon condenser microphone die against electromagnetic interference.

**2**. The silicon condenser microphone package of claim **1**, further comprising:

an environmental barrier secured to the package housing covering the acoustic port.

**3**. The silicon condenser microphone package of claim **2**, the environmental barrier being disposed between layers of the package housing.

**4**. The silicon condenser microphone package of claim **3**, the environmental barrier being disposed between a first conductive layer and a second conductive layer package housing for forming a capacitor within the package housing.

**5**. The silicon condenser microphone package of claim **2**, the environmental barrier having acoustic properties.

**6**. The silicon condenser microphone package of claim **2**, the environmental barrier providing particle screening or moisture screening.

**7**. The silicon condenser microphone package of claim **2**, the environmental barrier providing optical screening.

**8**. The silicon condenser microphone package of claim **7**, the environmental barrier comprising one of a polymeric material and a sintered metal material.

**9**. The silicon condenser microphone package of claim **1**, the package housing comprising a second acoustic port, the second acoustic port being acoustically coupled to the silicon condenser microphone die.

**10**. The silicon condenser microphone package of claim **9**, further comprising:

a second environmental barrier secured to the package housing covering the second acoustic port.

**11**. The silicon condenser microphone package of claim **1**, wherein the substrate and the cover are secured together by adhesive.

**12**. The silicon condenser microphone package of claim **11**, wherein the adhesive comprises a conductive adhesive.

US 8,018,049 B2

13

14

**13**. The silicon condenser microphone package of claim **11**,

wherein the adhesive comprises a patterned dry layer adhesive.

**14**. The silicon condenser microphone package of claim **11**,

wherein the adhesive comprises a nonconductive patterned dry layer adhesive and a conductive adhesive.

**15**. The silicon condenser microphone package of claim **1**,

where the substrate is formed to include an element selected from the group of elements consisting of: circuitry, ground planes, solder pads, ground pads, power planes, capacitors and through hole pads.

**16**. The silicon condenser microphone package of claim **15**,

wherein the element is formed within a layer of the substrate.

**17**. The silicon condenser microphone package of claim **1**, further comprising:

a recess formed within the substrate adjacent the silicon condenser microphone die creating a back volume.

**18**. The silicon condenser microphone package of claim **17**,

the recess being formed at least in part between layers of the substrate.

**19**. The silicon condenser microphone package of claim **1**,

the internal cavity forming a back volume and being coupled to a first side of the silicon condenser microphone die and the acoustic port being coupled to a second side of the silicon condenser microphone die.

**20**. The silicon condenser microphone package of claim **1**,

the package comprising a joined pair of microphones packages.

**21**. A method of manufacturing a silicon condenser microphone package comprising:

providing a panel comprising a plurality of interconnected package substrates, where each of the plurality of pack-

age substrates comprises at least one layer of conductive material and at least one layer of non-conductive material;

attaching a plurality of silicon condenser microphone dice to the plurality of package substrates, one die to each package substrate;

attaching a plurality of package covers, each comprising at least one layer of conductive material, to the panel, one package cover to each of the package substrates, where attaching the plurality of package covers to the panel comprises electrically connecting the at least one layer of conductive material in the package cover to the at least one layer of conductive material in the corresponding package substrate to form a shield to protect the silicon condenser microphone die against electromagnetic interference; and

separating the panel into a plurality of individual silicon condenser microphone packages.

**22**. The method of claim **21**,

where each of the plurality of package substrates further comprises an acoustic port.

**23**. The method of claim **22**,

where each silicon condenser microphone die is attached to its respective package substrate such that the die covers the acoustic port of its respective package substrate.

**24**. The method of claim **22**,

where each silicon condenser microphone die is attached to its respective package substrate such that the die does not cover the acoustic port of its respective package substrate.

**25**. The method of claim **21**,

where each of the plurality of package cover further comprises an acoustic port.

**26**. The method of claim **21**,

where the panel comprises printed circuit board material.

\* \* \* \* \*

PTO/SB/26 (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT | Docket Number (Optional) 092771.0038 |
|---|---|

In re Application of:  Minervini

Application No.: 11/741,881

Filed: April 30, 2007

For:  Silicon condenser microphone and manufacturing method

The owner*,  Knowles Electronics LLC                          , of _____100_____ percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application  which would extend beyond the expiration date of the full statutory term **prior patent** No. 6,781,231            as the term of said prior patent is defined in 35 U.S.C. 154 and 173, and as the term of said **prior patent** is presently shortened by any terminal disclaimer. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the  **prior patent** are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of the  term of any patent granted on the instant application that would extend to the expiration date of the full statutory term as defined in 35 U.S.C. 154 and 173 of the **prior patent**, "as the term of said **prior patent** is presently shortened by any terminal disclaimer," in the event that said **prior patent** later:
      expires for failure to pay a maintenance fee;
      is held unenforceable;
      is found invalid by a court of competent jurisdiction;
      is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
      has all claims canceled by a reexamination certificate;
      is reissued; or
      is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

Check either box 1 or 2 below, if appropriate.

1. ☐  For submissions on behalf of a business/organization (e.g., corporation, partnership, university, government agency, etc.), the undersigned is empowered to act on behalf of the business/organization.

     I hereby declare that all statements made herein of my own knowledge are true and  that all statements made on in formation and belief are believed to be true; and further that th ese statements were made  with the knowledge that willful false s tatements and the like so made are punis hable by fine or imprisonment, or  both, under Se ction 1001 of Title 18 of the United States Code and that such    willful false statements may jeopardize the validity of the application or any patent issued thereon.

2. ☑  The undersigned is an attorney or agent of record.  Reg. No. 51,585

| / William D. Cramer / | 02/04/2011 |
|---|---|
| Signature | Date |

| William D. Cramer | |
|---|---|
| Typed or printed name | |

| | 214-462-6418 |
|---|---|
| | Telephone Number |

☑  Terminal disclaimer fee under 37 CFR 1.20(d) included.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

*Statement  under 37 CFR 3.73(b) is required if terminal disclaimer is signed by the assignee (owner).
Form PTO/SB/96 may be used for making this certification. See MPEP § 324.

This collection of information is required by 37 CFR 1.321. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and  1.14.  This collection is estimated to take 12 minutes to c omplete, including gathering, preparing, and submitting the completed application form to the USPTO.  Time will vary depending upon the individual case.  Any comments on the amount of t ime you require to complete th is form and/or suggestions for reducing this bu rden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450.  DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.